UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    'O'

| Case No. | CR 14-328-CAS | | | Date | February 23, 2015 |
|---|---|---|---|---|---|

| Present: The Honorable | CHRISTINA A. SNYDER |
|---|---|

| Interpreter | N/A |
|---|---|

| Catherine Jeang | Lisa Gonzalez | David Herzog<br>Justin Rhoades |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendants: | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| 1) DOMINIC DORSEY | X | X | | 1) PHILIP DEITCH | X | X | |
| 2) REGINALD BAILEY | X | X | | 2) JAY LICHTMAN | X | X | |

**Proceedings:**   VARIOUS DEFENSE MOTIONS

## I.    INTRODUCTION AND BACKGROUND

Defendants Dominic Dorsey ("Dorsey") and Reginald Bailey ("Bailey") are charged with one count of conspiracy to interfere with interstate commerce by robbery, in violation of the Hobbs Act, 18 U.S.C. § 1951(a); five substantive Hobbs Act robbery counts; and five counts of possessing, using, carrying, and brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  See Dkt. No. 1.  Defendants are alleged to have robbed numerous gas stations, a pizza restaurant, and a bank as part of a series of "Cowboy Gun Bandit" robberies in the fall of 2013.  See generally id.  On February 23, 2015, the Court held a hearing on various defense motions.  After considering the parties' arguments, the Court finds and concludes as follows.

## II.    DEFENDANTS' MOTIONS TO DISMISS INDICTMENT ON JURISDICTIONAL GROUNDS

On December 24, 2014, Bailey filed a motion to dismiss the indictment on the ground that the charged robberies did not have a sufficient effect on interstate commerce to satisfy the jurisdictional element of the Hobbs Act.  Dkt. No. 42.  On January 13, 2015, Dorsey joined in that motion, adding limited briefing of his own.  Dkt. No. 51.  The government filed a consolidated opposition on January 26, 2015.  Dkt. No. 63.  Bailey and Dorsey filed separate

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    'O'

replies on February 9, 2015.  Dkt. Nos. 67, 74.  For the reasons that follow, the motions are **DENIED**.

A.    **Legal Standards**

1.    Pretrial Motion to Dismiss

On a pretrial motion to dismiss an indictment, a court "must presume the truth of the allegations in the charging instrument[]."  United States v. Jensen, 93 F.3d 667, 669 (9th Cir. 1996).  "[T]he issue in judging the sufficiency of the indictment is whether the indictment adequately alleges the elements of the offense and fairly informs the defendant of the charge, not whether the Government can prove its case."  United States v. Buckley, 689 F.2d 893, 897 (9th Cir. 1982).  The prosecution "need not allege . . . supporting evidence, but only the 'essential facts necessary to apprise a defendants of the crime charged.' "  Id. (quoting United States v. Markee, 425 F.2d 1043, 1047–48 (9th Cir. 1970)).  Morever, a defendant " 'may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence.' "  Jensen, 93 F.3d at 669 (quoting United States v. Mann, 517 F.2d 259, 267 (5th Cir. 1975)).  Accordingly, the court " 'should not consider evidence not appearing on the face of the indictment.' "  Id. (quoting United States v. Marra, 481 F.2d 1196, 1199–1200 (6th Cir. 1973)).

2.    The Hobbs Act's Jurisdictional Element

The Hobbs Act provides in part:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be [punished] . . . .

18 U.S.C. § 1951(a).  The statute defines "commerce" as commerce within the District of Columbia or other federal land, and "all commerce between any point in a State . . . and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction."  Id. § 1951(b)(3).  Both the Supreme Court and the Ninth Circuit have "emphasized the broad reach of the 'affects commerce' language of the Act."  United States v. Lynch, 437 F.3d 902, 909 (9th Cir. 2006) (en banc) (per curiam); see United States v. Culbert, 435 U.S. 371, 373 (1978) ("These words do not lend themselves to restrictive interpretation; as we have recognized, they

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    **'O'**

'manifest . . . a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.' " (quoting <u>Stirone v. United States</u>, 361 U.S. 212, 214 (1960))).

The Ninth Circuit has held that the government need only prove that a defendant's acts had "a *de minimis* effect on interstate commerce to support a Hobbs Act violation."[1]  <u>United States v. Atcheson</u>, 94 F.3d 1237, 1241 (9th Cir. 1996).  "The interstate nexus requirement is satisfied 'by proof of a probable or potential impact' on interstate commerce." <u>Lynch</u>, 437 F.3d at 909 (quoting <u>United States v. Huynh</u>, 60 F.3d 1386, 1389 (9th Cir. 1995)).  Accordingly, convictions under the Hobbs Act have been "consistently upheld"

> even where the connection to interstate commerce was slight.  <u>See, e.g.</u>, <u>United States v. Pascucci</u>, 943 F.2d 1032, 1035 (9th Cir. 1991) (defendant threatened to deliver embarrassing audio tapes to his victim's employer, a corporation engaged in interstate commerce); <u>United States v. Hanigan</u>, 681 F.2d 1127, 1130–31 (9th Cir. 1982) (defendant robbed three undocumented alien farm workers, affecting the movement of labor across borders);  <u>United States v. Phillips</u>, 577 F.2d 495, 501 (9th Cir. 1978) (defendant's extortion "threatened the depletion of resources from a business engaged in interstate commerce").

<u>Lynch</u>, 437 F.3d at 909 (citation formatting altered) (quoting <u>Atcheson</u>, 94 F.3d at 1243).

**B.     Application**

As noted above, the indictment charges robberies of three gas stations, a Papa John's pizza restaurant, and a Citibank branch, as well as a conspiracy to commit the aforementioned robberies and related gun crimes.  The indictment alleges that defendants obtained approximately $600 from the Papa John's, between $55 and $1,200 each from several gas

---

[1]Defendants submit that because "the commercial activities at issue were intrastate, the 'substantially affects' [commerce] test of [<u>United States v. Lopez</u>, 514 U.S. 549 (1995)] and not the *de minimis* test of <u>Atcheson</u> would be applicable." Dkt. No. 42 at 6.  This question-begging argument is unpersuasive: the *de minimis* test is what determines whether a charged Hobbs Act violation involves interstate, rather than solely intrastate, activities.  And the Ninth Circuit has clearly stated that <u>Lopez</u> "did not require a change in the *de minimis* standard" applied to the Hobbs Act's jurisdictional element.  <u>Lynch</u>, 437 F.3d at 909; <u>accord</u> <u>United States v. Boyd</u>, 480 F.3d 1178, 1179 (9th Cir. 2007) (per curiam).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                     **'O'**

stations, and over $55,000 from the Citibank.  Dkt. No. 42 Ex. A at 3–5.  The indictment charges that defendants' acts "obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce by robbery."  Id. at 6.  The indictment further alleges that the inventories of Papa John's and the three gas stations "traveled in interstate commerce," and that Citibank is a "national banking chain that operates in interstate commerce."  Id. at 6–10.  Under the *de minimis* standard cited above, and on the limited review a court conducts on a pretrial motion to dismiss, these jurisdictional allegations are more than sufficient.[2]

Defendants dispute that allegations that the robbed businesses bought and sold inventory from other states satisfy the jurisdictional element, arguing that this case "involves 'strictly intrastate robber[ies] which caused only a speculative indirect effect on a business engaged in interstate commerce.' "  Dkt. No. 42 at 8 (quoting Lynch, 437 F.3d at 910).  But defendants cite no case dismissing a Hobbs Act indictment under similar circumstances—or, indeed, under any circumstances.[3]  This is unsurprising because "[r]obbery of an interstate business . . . typically constitutes sufficient evidence to satisfy the Hobbs Act's interstate commerce element."  United States v. Rodriguez, 360 F.3d 949, 955 (9th Cir. 2004).  Cases abound in which appellate courts have upheld Hobbs Act convictions based on the sort of interstate commerce nexus defendants

---

[2]The Court notes that "[t]here is no requirement that a Hobbs Act indictment allege specific facts establishing an impact on interstate commerce."  United States v. Bellamy, 521 F. App'x 590, 592 (9th Cir. 2013) (unpublished) (citing United States v. Woodruff, 50 F.3d 673, 676 (9th Cir. 1995) ("Although the indictment contained no facts alleging how interstate commerce was interfered with, and did not state any theory of interstate impact, prior decisions of our court compel the conclusion that the indictment was sufficient.")).  Accordingly, defendants' entire argument may simply be non-cognizable on a motion to dismiss an indictment.  Out of an abundance of caution, the Court nevertheless addresses its substance.

[3]At oral argument, Bailey's counsel contended that United States v. Collins, 40 F.3d 95 (5th Cir. 1994), is such a case.  But the Collins court did not hold that a Hobbs Act indictment should have been dismissed; rather, it determined that insufficient evidence of an interstate commerce nexus had been introduced at trial to support one of the two Hobbs Act robberies of which the defendant was convicted.  Id. at 99–101.  Notably, Collins only reversed the defendant's conviction for robbing an individual in his home, and drew a number of distinctions between robberies of "business or similar entities engaged in interstate commerce" on the one hand, and individuals on the other hand.  Id. at 99–100.  It was in the context of a robbery of an individual that the Collins court articulated the "speculative indirect effect on a business engaged in interstate commerce" language on which Bailey relies.  In fact, the Collins court affirmed the defendant's Hobbs Act conviction for robbing a single Denny's restaurant.  Id. at 101.  Collins weakens, not strengthens, defendants' motions to dismiss.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**             **'O'**

maintain is insufficient.  See United States v. Ridgley, 511 F. App'x 654, 654–55 (9th Cir. 2013) (unpublished) (conviction for robbery of two pizza deliveryman upheld where the restaurants "engaged in interstate commerce because their supplies and ingredients came from out of state"); United States v. Sutton, 337 F.3d 792, 796 n.2 (7th Cir. 2003) (jurisdictional requirement met by similar robberies because the "aggregate transactions of banks, restaurants and retail stores" have a substantial effect on interstate commerce, "even if the specific events prosecuted do not, themselves, have a substantial effect on interstate commerce"); see also United States v. Dean, 517 F.3d 1224, 1228 (11th Cir. 2008) (evidence that defendants stole less than $4,000 from "a bank with interstate branches . . . open to out of state customers was sufficient to establish an effect on commerce"); United States v. Jiminez-Torres, 435 F.3d 3, 9 (1st Cir. 2006) (sufficient that gas station in Puerto Rico purchased gasoline from the Virgin Islands).  Indeed, in an unpublished disposition, the Ninth Circuit recently reversed a district court's dismissal of a Hobbs Act indictment where the defendant had robbed only one convenience store, for $135.  United States v. Bellamy, 521 F. App'x 590, 591 (9th Cir. 2013). The court explained that the "fact that Bellamy robbed a convenience store that obtains its inventory from out of state sources establishes the requisite impact on interstate commerce."[4] Id.  Defendants' argument to the contrary is without merit.

Defendants also argue that "due to the anticipated absence of proof on the interstate commerce element of the Hobbs Act charges, those charges should be dismissed so that the case can be prosecuted in state court," and that the gun charges predicated on those Hobbs Act

---

[4]In reply briefing on this and other motions, Bailey argues that the government's citations to recent unpublished Ninth Circuit cases should be ignored as lacking in any authority, persuasive or otherwise.  Bailey correctly points out that unpublished dispositions "are not precedent" except under circumstances not relevant here.  Ninth Circuit R. 36-3(a).  However, unpublished decisions issued on or after January 1, 2007 may be cited "as persuasive authority pursuant to Ninth Circuit Rule 36-3(b)."  Uche-Uwakwe v. Shinseki, 972 F. Supp. 2d 1159, 1189 n.14 (C.D. Cal. 2013); Nuh Nhuoc Loi v. Scribner, 671 F. Supp. 2d 1189, 1201 n.10 (S.D. Cal. 2009) ("Although still not binding precedent, unpublished decisions [postdating 2006] have persuasive value and indicate how the Ninth Circuit applies binding authority.").  Bailey's cited authority to the contrary, Sorchini v. City of Covina, 250 F.3d 706, 708–09 (9th Cir. 2001) (per curiam), was decided in 2001, when Rule 36-3(b) only permitted unpublished dispositions to be cited for "factual purposes."  After the rule was amended, the Ninth Circuit expressly held: "as of January 1, 2007, we must now allow parties to cite even unpublished dispositions and unpublished orders as persuasive authority."  Animal Legal Def. Fund v. Veneman, 490 F.3d 725, 733 (9th Cir. 2007) (emphasis added).  To the extent that the Court cites unpublished decisions in this order, it does so for their persuasive value.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    **'O'**

charges should be dismissed as well.  Dkt. No. 42 at 8–9.  But as noted above, a defendant "may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence."  Jensen, 94 F.3d at 669 (internal quotation marks omitted).[5]

Because the indictment sufficiently alleges Hobbs Act violations and defendants' arguments for dismissal run counter to settled law, the Court **DENIES** both defendants' motion to dismiss the indictment.

## III.   DEFENDANTS' MOTION TO SUPPRESS PHONE AND CELL SITE RECORDS FROM STATE SEARCH WARRANT

On December 24, 2014, Bailey filed a motion to suppress phone and cell site records obtained pursuant to state court orders issued on or about November 6 and November 14, 2013.  Dkt. No. 43.  Dorsey joined in the motion on February 9, 2015.  Dkt. No. 54.  The government filed a consolidated opposition on January 26, 2015, and Bailey replied on February 9, 2015.  Dkt. Nos. 59, 72.  For the reasons that follow, the motion is **DENIED**.

### A.   Background

On November 6, 2013, Los Angeles Superior Court Judge Cathryn Brougham issued a court order concerning certain records related to a cellular telephone account associated with the number (213) 503-5495 (the "503" number).  Dkt. No. 43 Ex. A.  The order approved an application by the Los Angeles County Sheriff's Department ("LASD") made "pursuant to Title 18, United States Code Sections 2703(c), 2703(d), 3122, and 3123," and was issued pursuant to 18 U.S.C. §§ 2703(c)(1)(B) and 2703(d).  Id. at 1–2.  The Superior Court ordered Verizon Wireless (as well as any other telecommunications carrier that provides service to the 503 number due to roaming agreements or changes in service) to provide certain information for a

---

[5]Contrary to Dorsey's argument, Federal Rule of Criminal Procdure 12 does not suggest otherwise.  Rule 12 states that a "party may raise by pretrial motion any defense . . . that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  A court cannot determine the sufficiency of the evidence supporting the jurisdictional element of charged Hobbs Act violations without a trial.  See Jensen, 93 F.3d at 669 (" 'There is no summary judgment procedure in criminal cases.  Nor do the rules provide for a pre-trial determination of the evidence.' " (quoting United States v. Critzer, 951 F.2d 306, 307 (11th Cir. 1992) (per curiam))).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                '**O**'

time period beginning September 1, 2013, and continuing for thirty days after issuance of the order.  Id. at 1.  Specifically, the order covered:

- **Subscriber/Account Information**, including but not limited to: Name, address, driver's license number, social security number, alternate telephone numbers, payment method, account notes, application information, billing statements, activation/suspension dates,  make/model of handset . . . [and various forms of] equipment identifying information.
- **Call Detail Records with Cell site Location** for the aforementioned time period.  The Call Detail Records should include all inbound and outbound calls, direct dispatched number(s), whether published or non-published, blocked or un-blocked, including SMS and MMS text messages on the Target Telephone(s).  The cell site information requested includes, but is not limited to, the location of cell site/sector, beginning and ending location of the Target Telephone(s), Location Area Code (LAC), Cellular ID (CID), switch information, latitude, longitude, tower orientation, azimuth, direction and strength of signal.

Id.  The order also provided that, upon request from law enforcement, "any and all telecommunications carriers subject to regulation by the Federal Communications Commission . . . shall provide" similar information or "initate a signal . . . to determine the location of the subject's mobile device . . . at five (5) minute intervals for a thirty (30) day period from the date this order was signed by the Court."  Id. at 2.  The order prohibited law enforcement agencies acting under authority of the order from intercepting the contents of any communications.  Id. at 3.

The aforementioned order was supported by an LASD detective's affidavit representing that she and her partner had been investigating a series of robberies that occurred between November 18, 2012 and October 26, 2013.[6]  Id. at 5.  She averred that "the robberies appear to be committed by the same individuals" because of similarities in involved clothing, weapon, style of robbery, and a getaway vehicle.  She described the two suspects as (1) "Male Black, mid 30's, approximately 6'00", 200 pounds" and (2) "Male Black, 5'05-5'08", 160 pounds," and

---

[6]The Court has excised from its discussion and consideration of this and other affidavits supporting search warrants certain evidence obtained from a July 2011 traffic stop, which is the subject of a separate suppression motion that, for reasons discussed in Section VII below, the Court does not rule on at this time.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**          **'O'**

noted that in each robbery the suspects "covered their face[s] with bandanas." The detective identified a vehicle used in the robberies as belonging to Jacqueline Martin ("Martin"), who she indicated was "believed to be the driver of the suspect vehicle in some of the robberies" and who "has a child with [Dorsey], who matches the first suspect's description." Id.

The affidavit states that the detective had located a cellular telephone number for Martin through "public records and . . . a contact number . . . Martin had previously provided." The detective further averred that Bailey "matche[d] the description of the second robbery suspect involved in the series." She also noted that "Bailey's criminal history includes bank robberies." The affidavit states that a detective had observed Dorsey with Bailey on November 5, 2013. The affiant then stated that using "Sheriff's Resources, [she had] located a cell phone number" for Bailey—the 503 number—and had confirmed that the number corresponded to an active Verizon Wireless account. Based on these facts, the affiant requested "a court order to obtain records for" the 503 number and two other numbers not at issue in this motion "to identify any possible further suspects, locations of the persons believed to be involved in the crimes, and identify the persons['] whereabouts." The affiant explained that the requested record would "assist in determining if [the suspects were] involved in the robbery series based on their whereabouts during the time of the robberies." Id.

On November 14, 2013, LASD sought and obtained a similar § 2703 order for telephone number (310) 947-7057 (the "947 number"), linked to a Sprint-Nextel account. The application for this order included the same information provided in support of the 503 number order, as well as some additional details, including the license plate number of Martin's car. Dkt. No. 43 Ex. B at 5. The affidavit stated that a Los Angeles Police Department ("LAPD") detective had viewed surveillance video of Dorsey retrieving something from a vehicle at an impound lot while wearing "what appeared to be the same shoes as the larger suspect in the robbery series." He was accompanied an older black male who matched the second suspect's description in that he (1) appeared to be the same height and weight, (2) wore eyeglasses, (3) had a gray beard (as compared to a "salt and pepper mustache" described in one of the robberies), and (4) "walked exactly like the suspect seen by [the LAPD detective] in the robbery surveillance videos." The affiant stated that the 503 number belonged to Bailey and that records of that account showed "numerous phone calls" to the 947 number. Id.

**B.    Analysis**

Defendants characterize the court orders at issue as "search warrants," and cite cases involving the Fourth Amendment standard of probable cause. The government points out, however, that the orders were issued pursuant to 18 U.S.C. § 2703(d), part of the federal Stored Communications Act ("SCA"). See Dkt. No. 43 Exs. A, B. That statute provides in part:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    **'O'**

A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity—

> (A) obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure (or, in the case of a State court, using State warrant procedures) by a court of competent jurisdiction; [or]
> (B) obtains a court order under subsection (d) of this section . . . .

18 U.S.C. § 2703(c)(1).[7]  Subsection (d), referenced above, provides in relevant part:

> A court order for disclosure under subsection (b) or (c) may be issued by any court that is a court of competent jurisdiction and shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that . . . the records or other information sought, are relevant and material to an ongoing criminal investigation.

18 U.S.C. § 2703(d).  As noted above, the Superior Court issued the two orders pursuant to § 2703(c)(1)(B) and (d).  Moreover, Verizon Wireless and Sprint-Nextel are "provider[s] of electronic communication service" within the meaning of § 2703(c), the information sought was "record[s] or other information pertaining to a subscriber or customer of" such a provider, and the information did not include the "contents of communications."[8]  Therefore, the relevant

---

[7]"Each option in § 2703(c)(1) is an independently authorized procedure."  In re Application of United States for Order Directing Provider of Elec. Commc'n Serv. to Disclose Records to Gov't, 620 F.3d 304, 313 (3d Cir. 2010) [hereinafter In re Order Directing Provider]. That is, a governmental entity may either seek a warrant pursuant to subsection (A), apply for a court order pursuant to subsection (B) and § 2703(d), or pursue one of three other procedures authorized in subsections (C) through (E).

[8]"[E]lectronic communication service" is defined to mean "any service which provides to users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15); see id. § 2711(1) (applying the definitions in § 2510 to the provisions of the SCA). "There is no dispute that historical CLSI [cell site location information] is a 'record or other information pertaining to a subscriber . . . or customer,' and therefore falls within the scope of § 2703(c)(1)."  In re Order Directing Provider, 620 F.3d at 307–08; accord United States v. Martinez, No. 13CR3560-WQH, 2014 WL 5480686, at *4 (S.D. Cal. Oct. 28, 2014); United

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**               **'O'**

issues are (1) what standard applies to court orders issued pursuant to § 2703(d), (2) whether the orders in question met that standard, and (3) if the standard was not met, what remedies are available.

As stated above, the statute pursuant to which the orders were issued requires that law enforcement support an application with "specific and articulable facts showing that there are reasonable grounds to believe that . . . the records sought, are relevant and material to an ongoing criminal investigation."  18 U.S.C. § 2703(d) (emphasis added).  Below, the Court first explains that the Fourth Amendment does not apply to the orders at issue (and that even if it did, the subscriber information and historical cell site data would likely be admissible under the good faith exception).  Second, the Court concludes that the orders at issue met the applicable SCA standard for historical cell site data—and even if they did not, that statute would not permit the Court to suppress any evidence on that basis.

   1.  The Fourth Amendment Does Not Apply.

Although the Ninth Circuit has not yet ruled on the issue, the vast majority of courts to have done so—including every district court within this circuit—have held that § 2703(d) does not require the government to show probable cause to obtain historical cell site data pursuant to the SCA, and that this lower standard does not violate the Constitution.

The Fifth Circuit recently examined § 2703(d) in the case of In re Application of United States for Historical Cell Site Data, 724 F.3d 600 (5th Cir. 2013).  The court explained that the " 'specific and articulable facts' standard is a lesser showing than the probable cause standard that is required by the Fourth Amendment to obtain a warrant."  Id. at 606.  The court then held that this lower standard does not violate the Fourth Amendment because a search and seizure does not occur "[w]here a third party collects information in the first instance for its own purposes," and the government later obtains that information through a § 2703(d) order."  Id. at

_____

States v. Rigmalden, No. CR 08-814-PHX-DGC, 2013 WL 1932800, at *10 (D. Ariz. May 8, 2013) ("Verizon clearly is a 'provider of electronic communication service' within the meaning of the SCA, and the historical cell site information . . . clearly constitute 'a record or other information pertaining to a subscriber or customer of such service.' ").  With regard to wire, oral, or electronic communications, "contents . . . includes any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. § 2510(8).

  [9]Accord United States v. Cerna, No. CR 08-0730 WHA, 2010 WL 3749449, at *18 (N.D. Cal. Sept. 22, 2010) (holding that § 2703(d) requires "a lesser showing than that required by the Fourth Amendment").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**               **'O'**

610.  The court reasoned that when a person " 'communicates information to a third party <u>even on the understanding that the communication is confidential</u>, he cannot object if the third party conveys that information or records thereof to law enforcement authorities.' "  <u>Id.</u> (emphasis in original) (quoting <u>SEC v. Jerry T. O'Brien, Inc.</u>, 467 U.S. 735, 743 (1984)).  The court concluded that because "cell site information is clearly a business record" and does not reveal the contents of communications, and because a person voluntarily uses a cellular telephone, which necessarily sends a signal to a nearby cell tower, a person has no reasonable expectation of privacy in cell site information.  <u>Id.</u> at 611–15; <u>accord</u> <u>United States v. Skinner</u>, 690 F.3d 772, 777–81 (6th Cir. 2012) (no reasonable expectation of privacy in cell site data).  The Third Circuit has also decided that § 2703(d) "does not require the traditional probable cause determination," but is instead "governed by the text of § 2703(d)."  <u>In re Order Directing Provider</u>, 620 F.3d at 313.  Examining the legislative history, that court concluded that the "specific and articulable facts" language "creates a higher standard than that required by the pen register and trap and trace statutes," but "less stringent than probable cause."  <u>Id.</u> at 315.[10]

District courts within this circuit have universally decided that historical cell site information may be obtained pursuant to a § 2703(d) order without a showing of probable cause.  For example, in <u>United States v. Martinez</u>, No. 13CR3560-WQH, 2014 WL 5480686 (S.D. Cal. Oct. 28, 2014), the court found no "reasonable expectation of privacy in the third party business records created and maintained by a cellular phone provider derived from information voluntarily conveyed to the cellular telephone provider."  <u>Id.</u> at *5 (citing <u>Smith v. Maryland</u>, 442 U.S. 735, 742 (1979)).  That court denied a motion to suppress cell site data and rejected an argument—similar to the one Bailey makes in his reply brief, Dkt. No. 72 at 6–8—that the Supreme Court's recent decisions in <u>United States v. Jones</u>, 132 S. Ct. 945 (2012), and <u>Riley v. California</u>, 134 S. Ct. 2473 (2014), compelled a different conclusion.  The court reasoned that obtaining historical cell site location information under § 2703(d) does not involve (1) physical intrusion on a defendant's property, (2) real-time tracking, or (3) the search or seizure of a cell phone, communication contents, or other information subject to a reasonable expectation of privacy, so as to implicate <u>Riley</u> or <u>Jones</u>.  <u>Id.</u> at *4.  Rather, the court found that

---

[10]A panel of the Eleventh Circuit reached a contrary conclusion in <u>United States v. Davis</u>, 754 F.3d 1205, <u>vacated</u>, 573 F. App'x 925 (11th Cir. 2014).  The court rejected the argument that historical cell site data is voluntarily conveyed to the service provider, reasoning that users are unlikely to know that their providers collect and store that information.  <u>Davis</u>, 754 F.3d at 1216–17.  The court concluded that historical "cell site location information is within the subscriber's reasonable expectation of privacy," and the "obtaining of that data without a warrant is a Fourth Amendment violation."  <u>Id.</u> at 1217.  However, the <u>Davis</u> decision has since been vacated pending rehearing en banc.  573 F. App'x 925 (11th Cir. 2014).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                     '**O**'

by using her cell phone, the defendant "voluntarily conveyed numerical information to the telephone company and exposed that information to the cell phone towers in the ordinary course of business." Id. at *5.[11]

Jurisprudence involving cellular telephones and related technology is evolving. See United States v. Guerrero, 768 F.3d 351, 358 (5th Cir. 2014) ("It may be that the 'technology is different' rationale that led the Riley Court to treat an arrestee's cell phone differently from his wallet will one day lead the Court to treat historical cell site data in the possession of a cellphone provider differently from a pen register in the possession of a pay phone operator."). But absent contrary direction from a higher court, this Court concludes that the government may constitutionally acquire subscriber information and historical cell site data pursuant to a § 2703(d) order by showing "specific and articulable facts showing that there are reasonable grounds to believe that . . . the records sought, are relevant and material to an ongoing criminal investigation."[12]

_____

[11]See also United States v. Moreno-Navarez, No. 13-CR-0841-BEN, 2013 WL 5631017, at *1–2 (S.D. Cal. Oct. 2, 2013) (upholding § 2703(d) and noting that "even if the statute were to be held unconstitutional, the good faith exception to the warrant requirement would apply"); United States v. Salas, No. CR F 11-0354 LJO, 2013 WL 4459858, at *3 (E.D. Cal. Aug. 16, 2013) ("With regard to the argument applying the . . . Fourth Amendment to cell site location information, there is no reasonable expectation of privacy since such records are in the hands of third parties."); United States v. Rigmalden, No. CR 08-814-PHX-DGC, 2013 WL 1932800, at *10 (D. Ariz. May 8, 2013) ("Courts have rejected . . . arguments that historical cell-site records cannot be obtained under the SCA."); United States v. Ruby, No. 12CR1073 WQH, 2013 WL 544888, at *3–7 (S.D. Cal. Feb. 12, 2013) (similar); United States v. Davis, Crim No. 10-339-HA, 2011 WL 2036463, at *3 (D. Or. May 24, 2011) ("It is well established that a reasonable expectation of privacy extends only to the content of telephone conversations, not to records that indicate that the conversations occurred. Basic subscriber data which identifies a call's origination, destination, duration, and time of call enjoy no privacy protection because the data is incidental to the use of the telephone, and contains no content information." (citations omitted)).

[12]Bailey that the Court should apply a probable cause standard because the application included a "Statement of Probable Cause" and the order stated that it was "based upon probable cause." Bailey argues that "[t]his was consistent with the statutory language in 18 U.S.C. § 2703(c)(1)(A) which permits a governmental entity to obtain the phone records based on a 'warrant' " using state warrant procedures rather than the process contained in §2703(d). Dkt. No. 72 at 3–4. But the order expressly states that it was issued "pursuant to 18 U.S.C. 2703(c)(1)(B) and 2703(d)." Dkt. No. 43 Ex. A at 2. Given this clear expression of the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**          **'O'**

Even if this Court—along with every other district court within this circuit to have addressed the issue and two Courts of Appeal—is wrong about the inapplicability of the Fourth Amendment, the evidence at issue would likely be admissible under the good faith exception first articulated in United States v. Leon, 468 U.S. 897 (1984), which also applies to "an officer acting in objectively reasonable reliance on a statute" authorizing a warrantless search or seizure of evidence, Illinois v. Krull, 480 U.S. 340, 350–56 (1987).  Because the vast majority of courts has upheld the constitutionality of § 2703(d), and because the orders were supported by affidavits containing some grounds for suspicion, the officers involved in executing the orders at issue could, at the very least, have reasonably relied on the Superior Court's issuance of the orders.  See Moreno-Navarez, 2013 WL 5631017, at *2 (law enforcement officers relying on § 2703(d) order issued by neutral magistrate would qualify for good faith exception); United States v. Graham, 846 F. Supp. 2d 384, 405-06 (D. Md. 2012) ("Even if the government's acquisition of historical cell site location records in this case had been in violation of the Defendants' Fourth Amendment rights, it obtained those records in good faith reliance on a constitutional statute and valid Orders issued by [neutral judicial officers].");  United States v. Jones, 908 F. Supp. 2d 203, 214–16 (D.D.C. 2012) (similar).  Indeed, even the Eleventh Circuit's since-vacated opinion in Davis, which decided contrary to the majority of cases cited herein that the Fourth Amendment does protect historical cell site data, applied the good faith exception and declined to suppress the evidence at issue.  754 F.3d at 1218.[13]  Accordingly, while the Court joins its sister district courts in concluding that the Fourth Amendment does not apply to historical cell site data, a contrary conclusion would still not lead to the suppression of the evidence at issue.

2.      The Orders at Issue Met the § 2703(d) Standard.

The Court finds that the orders at issue were supported by "specific and articulable facts" constituting "reasonable grounds" to believe that the records sought were "relevant and

---

statutory authority on which the order was based, the Court is not persuaded to construe the order as arising under a different provision merely because the Superior Court found the application supported by a greater showing of suspicion than was actually required.

[13]Contrary to Bailey's assertions at oral argument, the Court's conclusion that the good faith exception would apply is not based on a finding that the search application was supported by probable cause.  Rather, like numerous other courts, this Court finds that, in light of considerable case law holding that probable cause need not be established to obtain historical cell site data under § 2703(d), it would be reasonable for a law enforcement officer to rely on an order supported by an affidavit containing some grounds for suspicion, though not a showing of probable cause.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**         **'O'**

material" to the relevant investigation.  As regards the 503 number, the November 6, 2013 order was supported by an experienced detective's sworn statement that the 503 number was linked to Bailey, who had a criminal history including bank robberies, and had been recently observed with Dorsey, who had in turn been linked to the owner of a car used in the series of robberies.[14] The affidavit also indicated that Bailey and Dorsey matched the rough physical descriptions of the two suspects that had committed the series of robberies.  Moreover, because the records sought covered a time period in which the robberies being investigated were committed, they were reasonably likely to help determine the suspects' whereabouts during those robberies, which would have been material to the investigation.  Therefore, whether or not the same facts would have supported a finding of probable cause for a search warrant, the November 6, 2013 order was supported by "specific and articulable facts" that met the lesser standard of § 2703(d).[15]

As regards the 947 number, the November 14, 2013 application was supported by the same facts, as well as by surveillance that further linked Dorsey to the car used in the robberies, and to a person matching the description of the second robbery suspect.  Moreover, the affidavit supporting that order indicated "numerous phone calls" between the 503 and 947 telephone numbers.  This order, too, was supported by specific facts giving the issuing judge reasonable grounds to believe that the records sought were material to the ongoing investigation.

> 3.      No Suppression Remedy Is Available for Violations of the SCA.

Even if the orders did not meet the § 2703(d) standard, the "Stored Communications Act does <u>not</u> provide an exclusion remedy.  It allows for civil damages, and criminal punishment, but nothing more."  <u>United States v. Smith</u>, 155 F.3d 1051, 1056 (9th Cir. 1998) (emphasis in original) (citations omitted).  Indeed, the SCA "expressly rules out exclusion as a remedy" by making its remedial provisions exclusive.  <u>Id.</u> (citing 18 U.S.C. § 2708); <u>see also</u> <u>United States v. Corbitt</u>, 588 F. App'x 594 (9th Cir. 2014) ("Suppression of the evidence seized is not available as a remedy for a statutory violation of the [Stored Communications] Act."); <u>United States v. Guerrero</u>, 768 F.3d 351, 358 (5th Cir. 2014) ("[S]uppression is not a remedy for a

---

[14]Because the application contained other facts linking the two defendants, the Court does not rely for purposes of this motion on evidence pertaining to the July 7, 2011 traffic stop, which Bailey has challenged through a separate motion.

[15]Defendants argue that the orders are also invalid because the affidavits omitted other, inconsistent physical descriptions of the robbery suspects.  This argument is unpersuasive and, in any event, could not overcome the unavailability of a suppression remedy under the SCA.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**            **'O'**

violation of the Stored Communications Act."); United States v. Rigmalden, No. CR 08-814-PHX-DGC, 2013 WL 1932800, at *10 (D. Ariz. May 8, 2013) ("[E]ven if the SCA had been violated in some respect, Defendant's motion to suppress would be denied.  Suppression is not an available remedy for violations of the SCA.").  Defendants' suppression motions fail for this additional and independent reason.

        4.      To the Extent the Order Authorized the Real-time Collection of Cell Site Information, That Authorization Was Improper; However, Suppression of the Historical Cell Site Information Is Not Warranted on That Basis.

In contrast to the less stringent standard for obtaining historical cell site data pursuant to § 2703(d), described above, a majority of courts have taken the position that the government must make a showing of probable cause to acquire "real-time" or "prospective" cell site location data.  See United States v. Espudo, 954 F.3d 1029, 1035 (S.D. Cal.  2013) (collecting cases). The orders here authorized law enforcement to obtain real-time cell site data for the thirty days subsequent to the issuance of the orders.  The government concedes that such prospective data collection runs contrary to the majority of recent decisions, and represents that it "will not seek to introduce such evidence obtained through these orders," but rather "only seek to use the data . . . collected during the periods of September 1, 2013 through the date each order was signed." Dkt. No. 59 at 7 n.4.  At oral argument, the government reiterated that it will not seek to introduce any real-time data obtained pursuant to the state court orders.

Because the government clearly sought and obtained §2703(d) orders for historical cell site data, the Court rejects Bailey's suggestion in his reply brief—unaccompanied by legal authority—that because that order also authorized the collection of prospective data, the application to obtain historical data must also have been supported by probable cause, and should be suppressed.  Even assuming *arguendo* that some portions of the order were invalid, suppression of evidence validly obtained through other portions of the order would not follow. See United States v. Sears, 411 F.3d 1124, 1129 (9th Cir. 2005) (" '[O]nly those items seized pursuant to invalid portions of a warrant must be suppressed.' " (citing United States v. Gomez-Soto, 723 F.2d 649, 654 (9th Cir. 1984)).  This rule of severance is especially appropriate where the government disclaims the intention to use the arguably unlawful evidence.[16]  Nevertheless,

---

[16]Because the government represents that it will not seek to introduce real-time cell site data obtained pursuant to the order, the Court need not resolve the question of whether such evidence would be admissible under the good faith exception.  Compare Espudo, 954 F.3d at 1044 ("[E]ven though the Government did not obtain a warrant based on probable cause prior to seeking real-time cell site location data, which this Court finds is required, this evidence is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    **'O'**

at the February 23, 2015 hearing, the Court instructed government counsel to assist defense counsel in separating historical from real-time cell site data.

### C.     Conclusion

For the foregoing reasons, the Court **DENIES** defendants' motion to suppress subscriber information and historical cell site data obtained pursuant to the November 6 and November 14, 2013 state court orders.

## IV.   BAILEY'S MOTION TO SUPPRESS CELL SITE INFORMATION OBTAINED PURSUANT TO FEDERAL SEARCH WARRANT

On December 24, 2014, Bailey filed a motion to suppress cell site information and records obtained pursuant to a federal search application and order issued on or about December 12, 2013, by United States Magistrate Judge Frederick F. Mumm.  Dkt. No. 44.   The government filed a consolidated opposition to the instant motion, as well as Dorsey's related motion discussed below, on January 26, 2015.  Dkt. No. 58.  Bailey filed a reply on February 9, 2015.  Dkt. No. 68.  For the reasons that follow, the motion is **DENIED**.

### A.     Background

On or about December 12, 2013, the government applied for an order that the relevant cellular telephone service provider must furnish the FBI and LASD with information relating to a cellular telephone believed to be used by Bailey, linked to the number (213) 503-3495 (the "Subject Telephone").  See Dkt. No. 44 Ex. A.  Specifically, the government sought "information reflecting the location of cellular towers . . . related to the use of the Subject Telephone" for a prospective period of sixty days.  Id. at 2.  The government did not seek to intercept the contents of any communications, but instead sought to ascertain the locations at which calls were sent and received, as well as the telephone numbers involved and the duration of the communications.  See id. at 2–4.

The application attached a declaration sworn by Sean Sterle ("Sterle"), who at that time had been employed as an FBI special agent for fifteen years.  Dkt. No. 44 Ex. A (Sterle Decl.) ¶ 1.  Sterle represented that through his experience, which included investigating robberies of banks and other commercial institutions, he had become "familiar with the methods employed by robbers to take money from banks and commercial institutions."  Id. ¶¶ 2–3.  After

nonetheless admissible under the good faith exception.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**        **'O'**

explaining his qualifications and the purpose of the declaration, Sterle set forth the following information in support of probable cause.

Sterle explained that Bailey and Dorsey were suspected to be the "Cowboy Gun Bandits" thought to have committed a series of thirty-one armed robberies or attempted armed robberies of banks and commercial institutions in the Los Angeles area. Id. ¶ 5. Sterle declared that the modus operandi in each of the robberies was similar. Specifically, "[i]n most cases," both suspects entered the target location "wearing the same dark clothing (black hoodie sweatshirt, black or dark blue jeans)," with masks or bandanas covering their faces. One or both of the suspects was typically "armed with a large chrome/blue steel revolver and/or a blue steel semi-automatic handgun." The suspects would "point the firearm at the cashier, demand he or she open the cash register, and take the money." Id. ¶ 6.

Sterle declared that in six of the robberies, "witness statements or security video revealed that Bailey and Dorsey fled the robbery in a dark colored vehicle." In a September 30, 2013 robber of a Papa John's, a witness observed the suspects enter a compact vehicle, and the witness gave authorities the partial license plate number "6TNB." In an October 6, 2013 ARCO gas station robbery, a witness observed a dark Nissan Altima parked behind the gas station, and reported the last three digits of the license plate as "435." On October 10, 2013, Dorsey was involved in a minor traffic collision while driving a black Nissan Altima with the license plate "6TBN435." The registered owner of that vehicle was Dorsey's wife. Sterle explained that this license plate "matches the previously reported combined license plates—with the 'B' and 'N' in switched positions." Id. ¶ 7.

The declaration states that surveillance video of an October 25, 2013 robbery of another ARCO gas station shows Dorsey exiting a black Nissan Altima, entering the ARCO to pay for gas, and looking into the cash register when it is opened by the cashier. According to Sterle, Dorsey "appears to be wearing the same jeans and dark tennis shoes with white trim which were worn by him in the majority of the above robberies." Sterle stated that approximately five minutes later, the video shows a suspect Sterle believed to be Bailey entering the ARCO and pointing the chrome revolver at the clerk and another person. Sterle declared that when the suspect "attempted to take the money with his left hand [he] appeared to have trouble grasping it." Further, the "ring finger on Bailey's left glove appears to be empty in the security video." The video then shows the robber "set[ting] the gun down on the counter and [taking] the money with his right hand" before fleeing "in the direction the black Nissan Altima was last seen." Sterle noted that a "query of Bailey's Criminal History Record revealed that he is missing a finger on his left hand." Sterle related that in two of the other robberies (of a Shell gas station on September 24, 2013 and a Valero gas station on October 28, 2013), "a finger on Bailey's glove appears to be empty in the security videos." Id. ¶ 8.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**          **'O'**

Sterle asserted that Bailey and Dorsey were also suspected of robbing a Citibank branch in Glendale, California on November 5, 2013.  Id. ¶ 9.  In that robbery, two men entered the bank and a suspect Sterle believed to be Dorsey "pointed a semi-automatic handgun at the employees and climbed over one of the teller's windows."  A second man, believed to be Bailey, then "ordered several of the customers and employees to the ground while Dorsey removed the cash from each teller's cash drawer."  The two men fled, and a witness "observed the suspects leave the area in a gold/champagne colored Nissan Versa."  Id.  In a security video of the robbery, the suspect believed to be Dorsey "can be seen wearing the same black with white trim tennis shoes and jeans that are seen in the security videos of the previous robberies and the instance in which he purchased gas before the [October 25, 2013] ARCO Gas robbery."  Id. ¶ 10.  Additionally, "[s]everal frames of the security video show a finger of" the man believed to be Bailey's "left glove bent in odd directions, which is consistent with Bailey's lack of a ring finger on his left hand."  Id.

Sterle next set forth information linking Bailey and Dorsey.  On August 6, 2013, Dorsey was cited while driving a vehicle rented by Bailey.  Additionally, security video indicates that on November 2, 2013, Bailey and Dorsey drove to an impound lot, Hollywood Tow, to retrieve something from Dorsey's Jaguar automobile, which had been towed to that lot.  The video shows Bailey and Dorsey "wearing similar pants and shoes [as those] seen in many of the robbery security videos," and "clearly" shows Bailey's missing left ring finger.  Id. ¶ 12.

The declaration then describes information linking Bailey to the Subject Telephone.  On January 2, 2010, Bailey was involved in a traffic collision and, in a related police report, listed the Subject Telephone's number as his own.  Sterle declared that "[r]eview of publicly available databases also indicate[s] that Bailey is the user of the Subject Telephone Number."  The declaration also asserts that Bailey had "provided this number to rental car companies.  Finally, Sterle declared that the number "was also in contact with a number used by Dorsey during the period of the robberies."[17]  Id. ¶ 13.

---

[17]The declaration asserts that LASD previously obtained call detail records for the Subject Telephone through a state court order that expired on December 6, 2013.  Sterle Decl. ¶ 14. Information obtained pursuant to that order "indicate[d] that Bailey and Dorsey communicated during the time of the robberies, including within several hours of many of the robberies."  Id. Bailey unsuccessfully seeks to suppress evidence from this order in a separate motion discussed in this order; even if that evidence were suppressed, the Court's conclusion on the instant motion would not change.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**               **'O'**

Sterle declared that there had not been a suspected robbery by the pair since the November 2013 Citibank robbery, but that law enforcement anticipated that the two could "restart their robbery spree" once the $55,000 stolen from Citibank ran out.  The declaration asserts that "[i]n order to track Bailey to see if he is planning or committing additional robberies, it is important for law enforcement to be able to monitor his movements."  Sterle stated that cell site data "would assist law enforcement by providing a rough location for Bailey which would then allow for physical surveillance or the installation . . . of tracking devices on his vehicle."  The declaration also claims that the location information "may become relevant if and when [Bailey] is charged . . . and his arrest is sought," and would reduce the risk that the ongoing investigation would be compromised.  Id. ¶ 15.

United States Magistrate Judge Frederick R. Mumm issued the requested order on December 12, 2013, finding "probable cause to believe that cell-site information, likely to be received concerning the approximate location of the Subject Telephone . . . will constitute or yield evidence of" bank robbery and Hobbs Act violations committed by Bailey and Dorsey.  Dkt. No. 44 Ex. A.  Judge Mumm ordered the relevant service carrier to

> disclose, at such intervals and times as directed by the Investigating Agency, information concerning the location (physical address) of the cell-site at call origination (for outbound calling), call termination (for incoming calls), and, if reasonably available, during the progress of a call, for the Subject Telephone, as well as other information, apart from the content of any communication, that is reasonably available to the Carrier and that is requested by the Investigating Agency or any law enforcement agency working with the Investigating Agency, concerning the cell sites/sectors receiving and transmitting signals to and from the Subject Telephone while a call is in progress.

Id.  The order was to be effective for a period of sixty days, and apply to any changed telephone number assigned to the same telephone account.  Id.

**B.     Analysis**

1.     Legal Standards

"A search warrant is supported by probable cause if the issuing judge finds that, 'given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.' "  United States v. Underwood, 725 F.3d 1076, 1081 (9th Cir. 2013) (quoting Illinois v. Gates, 462 U.S. 213, 238

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**               **'O'**

(1983)).  "Whether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a 'commonsense, practical question.' "  United States v. Kelley, 482 F.3d 1047, 1050 (9th Cir. 2007) (quoting United States v. Gourde, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc)).  "Neither certainty nor a preponderance of the evidence is required."  Id.

 "A magistrate judge's finding of probable cause is entitled to great deference."  United States v. Clark, 31 F.3d 831, 834 (9th Cir. 1994); see also Gourde, 440 F.3d at 1069 ("We are not in a position to flyspeck the affidavit through de novo review. . . . This deferential approach is the antithesis of a 'grudging or negative attitude' toward search warrants and a 'hypertechnical rather than a commonsense' analysis." (citations omitted)); United States v. Wong, 334 F.3d 831, 835–836 (9th Cir. 2003) ("We review a magistrate judge's finding of probable cause to issue a search warrant for clear error.").  Still, "[a] reviewing court should find that probable cause is not met when the issuing judge lacked a 'substantial basis for . . . conclud[ing] that probable cause existed.' "  Underwood, 725 F.3d at 1081 (brackets in original; internal quotation marks omitted) (quoting Gates, 462 U.S. at 238–39).  "Conclusions of the affiant unsupported by underlying facts cannot be used to establish probable cause."  Id.  The supporting affidavit or declaration "must recite underlying facts so that the issuing judge can draw his or her own reasonable inferences and conclusions; it is these facts that form the central basis of the probable cause determination."  Id.  "Under the totality of the circumstances test," however, "otherwise innocent behavior may be indicative of criminality when viewed in context."  United States v. Chavez-Miranda, 306 F.3d 973, 978 (9th Cir. 2002).  "Additionally, issuing judges may rely on the training and experience of affiant police officers."  Id.

> 2.   Whether The Order Was Supported by Probable Cause to Suspect that Bailey Was One of the Robbers

 Bailey argues that "the warrant declaration made an insufficient showing . . . that Mr. Bailey was one of the robbers," and consists largely of unsupported conclusions.  Dkt. No. 44 at 9.  He contends that the declaration is even weaker once references to evidence he seeks to suppress through other motions is excised.[18]  Bailey also argues that, even if not excised,

---

    [18]See United States v. Nora, 765 F.3d 1049, 1058 (9th Cir. 2014) (explaining that where evidence cited in a search warrant affidavit is inadmissible, the warrant "remains valid if, after excising the tainted affidavit, the affidavit's remaining untainted evidence would provide a neutral magistrate with probable cause"; that determination is made "without the usual deference owed to the magistrate's initial finding of probable cause" (internal quotation marks and citations omitted)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**          **'O'**

evidence that Bailey and Dorsey were together in a vehicle years prior to the commission of the first robbery, or that there were calls "between phones connected to Bailey and Dorsey during the period of the robberies," does not without more show any connection to the robberies.  Id. at 10–11.  Further, Bailey discounts the observations of Bailey and Dorsey together at the Hollywood Tow in clothing matching that worn during the robberies, arguing that the clothing at issue is too commonplace to support a finding of probable cause.  Id. at 12.  Finally, although he admits that evidence that both Bailey and one of the suspects were missing fingers on their left hands has "some probative value," Bailey stresses that the affiant used words of "qualification" in describing the security videos (for example, that the ring finger of a glove "appears to be empty" or that a finger of a glove was bent in odd directions, "consistent with" Bailey's missing finger).  Id. at 12–13.

Under the applicable "practical, common-sense" approach, the Court finds that the factual allegations summarized in the background section above are sufficient to show probable cause.[19]  Even excising evidence Bailey seeks to suppress through other motions, there was ample evidence that Bailey and Dorsey were associates; therefore, the magistrate judge was not required to disregard entirely with regard to Bailey the significant evidence linking Dorsey to the robberies.  More importantly, a highly distinctive physical feature—a missing finger on the left hand—directly linked Bailey to the target robberies.  Bailey's suggestion that four separate videos suggesting that one of the robbers was missing a finger on the same hand should be discounted, because the affiant did not express absolute certainty, is an unpersuasive attempt to impose "a hypertechnical, rather than a commonsense" approach to interpreting a search warrant affidavit.  See Gates, 462 U.S. at 236.  In sum, the magistrate judge had a substantial basis for concluding that there was a reasonable probability that Bailey was one of the robbers.

> 2.    Whether the Order Was Supported by Probable Cause to Suspect that Evidence of the Target Crimes Would Be Found

Bailey argues that even if there was probable cause to suspect that he was one of the

---

[19]In its application, the government sought the requested information pursuant to a "hybrid theory" based on 18 U.S.C. §§ 3122(a)(1) and 3123(a)(1), which govern orders authorizing the installation and use of pen registers or trap and trace devices, and 18 U.S.C. § 2703(d), discussed above in section III.B.  In that application and the opposition to the instant motion, the government has maintained that, as a matter of law, it need not show probable cause to obtain an order of this type—but that because the application does show probable cause, the Court need not consider that position.  Accordingly, the Court applies traditional probable cause standards and does not address the government's "hybrid theory."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**              **'O'**

robbers, the warrant declaration "made an insufficient showing . . . that a search conducted well over one month from commission of the last robbery would reveal criminality." Dkt. No. 44 at 9. Even if the cell site information obtained pursuant to a state court order and linking Dorsey to Bailey is ignored (and it need not be in light of the Court's ruling in Section III), the magistrate judge would still have had grounds to conclude that Bailey was linked to the Subject Telephone because (1) Bailey provided that number to law enforcement, (2) public databases list Bailey as the number's user, and (3) Bailey provided the number to car rental companies. Thus, the issue is whether the physical location information sought by the government was reasonably likely to reveal evidence of the target crimes.

Bailey contends that the declaration supports only tracking him to see if he was "planning or committing additional robberies" or in the event that he was charged and his arrest sought. Accordingly, Bailey denies that the declaration includes any allegation that his cell site information would lead to evidence of his commission of the target offenses. Dkt. No. 44 at 13. The government responds that Sterle amply explained that "based on the large number of robberies in a short period of time, it was likely that Dorsey and Bailey would commit another robbery," and that being able to track Bailey's phone was important for locating him. Dkt. No. 58 at 10. Once law enforcement located Bailey, the government argues, agents could conduct surveillance of him to determine whether he was committing additional robberies. Moreover, the prosecution contends, because "Bailey used specific firearms during the robberies and had a distinctive physical characteristic, locating Bailey would likely involve finding the firearm and would certainly provide for closer examination of his missing finger, which would be a key piece of evidence" in prosecuting the previous robberies. The government also cites authority to the effect that warrants may be "issued for surveillance or tracking devices on probable cause that the 'search' (the surveillance or tracking) will uncover evidence of a crime, even though the crime may not yet have been committed." United States v. Rojas, 671 F.2d 159, 166 n.8 (5th Cir. 1982).

The government has the better of the argument. The magistrate judge had a substantial basis for concluding that there was a fair probability that evidence of Bailey's whereabouts would reveal evidence of the dozens of robberies thought to have been committed by the two robbers, including cash from the robberies, the distinctive handgun used in the robberies, or confirmation of Bailey's missing finger, which is a highly probative identifying detail tying him to the robberies. See United States v. Steeves, 525 F.2d 33, 38 (8th Cir. 1975) (explaining that people who own handguns often keep them on their persons). The magistrate judge could also have reasonably concluded that, because Bailey was suspected of committing approximately thirty robberies in a then-recent two-month period, Bailey's physical location might be reveal the planning or commission of additional robberies that the two suspects might conduct after their prior robbery proceeds ran out. Given the ample evidence linking Bailey to the robberies,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    **'O'**

the conclusion that evidence of Bailey's physical location could lead to additional evidence of those robberies was not clearly erroneous.

        3.      The Good Faith Exception

      Evidence obtained pursuant to a facially valid search warrant, later found to be invalid, is admissible if the executing officers acted in good faith and in objectively reasonable reliance on the warrant.  United States v. Leon, 468 U.S. 897, 922 (1984).  The "good faith test is an objective one," through which a court "ask[s] not what the executing officer believed, or could have believed, but 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.' "  United States v. Luong, 470 F.3d 898, 902 (9th Cir. 2006) (quoting Leon, 468 U.S. at 922).  This inquiry is limited to the four corners of the affidavit given in support of the warrant.  Id. at 904.  That affidavit "must establish at least a colorable argument for probable cause."  Id. at 903; see Leon, 468 U.S. at 926 (framing the inquiry as whether the affidavit is "sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause").

      " '[S]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness,' for 'a warrant issued by a magistrate [judge] normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.' "  Leon, 468 U.S. at 922.  But "the Supreme Court has identified at least four situations in which reliance on a warrant cannot be considered objectively reasonable, and therefore the good faith exception cannot apply:

> (1) when the affiant knowingly or recklessly misleads the judge with false information; (2) when the judge wholly abandons his or her neutral role; (3) when the affidavit is so lacking in indicia of probable cause that official belief in its existence is objectively unreasonable; and (4) when the warrant is so facially deficient that executing officers cannot reasonably presume it to be valid (i.e., it fails to specify the place to be searched or the things to be seized).

Luong, 470 F.3d at 902 (citing Leon, 468 U.S. at 914, 923).  "The government, not the defendant, bears the burden of proving that its agents' reliance upon the warrant was objectively reasonable."  United States v. Michaelian, 803 F.2d 1042, 1048 (9th Cir. 1986).  Bailey argues that "after excising the tainted allegations and affording no weight to the conclusory allegations, the remaining facts would not be sufficient to lead a reasonable judge to find probable cause," or to lead a reasonable law enforcement officer to rely upon the order. Dkt. No. 44 at 14–15. The Court disagrees.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                   **'O'**

As discussed above, the order in question was supported by probable cause.  But even if it were not, the affidavit certainly contains facts establishing a "colorable argument" for probable cause.  Additionally, other factors support the applicability of the good faith exception here.  First, the order was sought on a "hybrid" Pen Register Statute and Stored Communications Act theory, under which the government need not show probable cause to obtain real-time cell site data.  Although rejected by a majority of recent decisions, this theory has been accepted by some district courts, and has not been rejected by the Ninth Circuit.  Thus, law enforcement officials could arguably have reasonably relied on the order even if it was supported by a showing less than probable cause.  See United States v. Espudo, 954 F. Supp. 2d 1029, 1037–44 (S.D. Cal. 2013) (explaining that this " 'hybrid theory' . . . has been commonly put forth by the government when seeking real time cell site location data and rejecting that theory, but nonetheless applying the good faith exception because of conflicting district court decisions on the issue).  Second the application was signed by an Assistant United States Attorney, Dkt. No. 44 Ex. A at 6, which can support the reasonableness of a law enforcement agent's reliance.  See United States v. Freitas, 856 F.2d 1425, 1431–32 (9th Cir. 1988) (noting agents' reliance on legal opinion of Assistant United States Attorney, in addition to magistrate judge, in determining that district court had erred in refusing to apply good faith exception); Michaelian, 803 F.2d at 1047 ("The warrants and affidavit came under scrutiny at four levels of attorney review, further adding to the reasonableness of the agents' reliance thereon.").

For the reasons stated, the Court concludes that (1) the order was supported by probable cause and (2) even if it were not, the evidence would be admissible under the Leon good faith exception.  Therefore, the Court **DENIES** Bailey's motion to suppress real-time cell site information obtained pursuant to the federal order dated December 12, 2013.

**V.   DORSEY'S MOTION FOR AN EVIDENTIARY HEARING REGARDING USE OF A TELEPHONE NUMBER**

On January 13, 2015, Dorsey filed a motion joining in Bailey's motion to suppress cell site information obtained through the federal order discussed above.  Dkt. No. 54.  In that motion, Dorsey requested a hearing to determine whether there was evidence to link Dorsey to a telephone number which was the basis for a separate warrant.  In an opposition filed on January 26, 2015, the government attached the warrant in question, as well as the declaration filed in support of that warrant and a series of documents referenced in that declaration.  Dkt. No. 58. On February 10, 2015, Dorsey filed a response stating that "the government has provided counsel with additional documentation, which provides the link" between Dorsey and the telephone number in question.  Dkt. No. 75.  For that reason, Dorsey withdrew his request for an evidentiary hearing.  Id.  Accordingly, this motion is **DENIED** as moot.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                     **'O'**

## VI.   BAILEY'S MOTION TO SUPPRESS BANK ACCOUNT INFORMATION

On December 24, 2014, Bailey filed a motion to suppress evidence seized or derived from his Wells Fargo bank account pursuant to a state search warrant issued on or about November 15, 2013.  Dkt. No. 45.  The government filed an opposition on January 26, 2015, and Bailey replied on February 9, 2015.  Dkt. Nos. 60, 71.  For the reasons that follow, the motion is **DENIED**.

### A.   Background

On November 15, 2013, the California Superior Court issued a warrant to search and seize account information pertaining to a Wells Fargo bank account in Bailey's name.  Dkt. No. 45 Ex. A at 1.  The warrant covered account statements, deposit slips, and a host of other records pertaining to deposits and withdrawals, checks, credit agreements, wire transfers, credit card applications, safety deposit boxes, communications with the financial institution, and other transactions.  Id. at 2.  The warrant was supported by a Glendale police officer's affidavit stating that he met with LAPD Detective Chris Marsden ("Marsden"), the lead investigator on a series of approximately thirty-one robberies, the last of which occurred at a Citibank branch in Glendale.  According to the affidavit, Marsden believed that the same two suspects had committed each robbery based on the modus operandi of each crime, the use of handguns, the clothing and physical size of the suspects, statements made by each suspect during the robberies, and the fact that the suspects concealed their faces with a bandana or similar item in each robbery.  Marsden described the suspects as black males, one between 6' and 6'3", and the other around 5'7" with a "thin build."  Id. at 5–6.

The affidavit states that Marsden had reviewed surveillance videos of the robberies, "spoken to investigators from other law enforcement agencies and reviewed details of each and every robbery that has similar facts and circumstances" to the Citibank robbery.  He had identified a possibly involved vehicle, which belonged to Jacqueline Martin.  Marsden then searched records and discovered that Martin had a child with Dorsey, who was in turn "associated with" Bailey.  Marsden represented that searches of public databases indicate that Bailey and Dorsey two resided at a particular address in Hollywood at the same time.  The affidavit then details the two mens' criminal records.  Bailey's record includes four robberies conducted between 1968 and 1980, including one bank robbery.  Id. at 6–7.

The affidavit states that Marsden reviewed surveillance video of a robber at an ARCO station at 18076 Ventura Boulevard, Los Angeles, and that approximately five minutes before the robbery, Dorsey entered the station store and made a purchase.  Finally, the affidavit states that a detective had discovered that Bailey used a Wells Fargo credit or debit card to rent a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**               **'O'**

vehicle in August 2013, and that Bailey had rented twenty-one vehicles from a certain car rental business since 2010.  Id. at 7–8.

**B.     Analysis**

Bailey argues that the search warrant was not supported by probable cause, and that the evidence derived therefrom should be suppressed under the exclusionary rule of the Fourth Amendment.  The government contends that Bailey has no Fourth Amendment rights in the information sought, and that under the statute that does apply, suppression is not an available remedy.  The government is correct.

In United States v. Miller, 425 U.S. 435 (1976), the Supreme Court considered a defendant's motion to suppress documents obtained from two banks pursuant to allegedly defective grand jury subpoenas.  The Supreme Court affirmed the district court's denial of that motion on the ground that the defendant had no protected privacy interest in the evidence at issue.  Id. at 440.  The Court reasoned that the documents sought were not the defendant's "private papers," but rather "business records of the banks."  Id.  The Court "perceive[d] no legitimate 'expectation of privacy' " in the documents, which "contain[ed] only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business."  Id. at 442.  The bank records therefore fell under the rule that "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose."  Id. at 443.  Accordingly, the district court "correctly denied respondent's motion to suppress, since he possessed no Fourth Amendment interest that could be vindicated."  Id. at 445; see also United States v. Standefer, No. 06-CR-2674-H, 2007 WL 2301760, at *3 (S.D. Cal. Aug. 8, 2007) ("There is no reasonable expectation of privacy in financial records such as checks, deposit slips, and financial statements maintained by third party institutions such as banks.' " (quoting In re Grand Jury Proceedings, 40 F.3d 959, 962 (9th Cir. 1994)).

Bailey argues in his reply brief that Miller is "outdated" in light of the Supreme Court's subsequent decision in United States v. Jones, 132 S. Ct. 945 (2012), which determined that the attachment of a GPS tracking device to a vehicle, and subsequent use of that device to monitor the vehicle's movement, was a search within the meaning of the Fourth Amendment.  Although this argument lacks persuasive force for reasons including the obvious differences between a continuously tracked car and bank records held by a third party, this Court is bound to apply Miller, and for that reason does not address Bailey's reply in detail.  Because Bailey has no Fourth Amendment rights in his bank records, and because "a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL                    'O'

defendant's own constitutional rights," <u>United States v. Payner</u>, 447 U.S. 727, 732 (1980), Bailey's Fourth Amendment suppression argument fails.

"Congress, in response to <u>Miller</u>, enacted the Right to Financial Privacy Act of 1978, 12 U.S.C. §§ 3401–22 (1982)." <u>United States v. Mann</u>, 829 F.2d 849, 851 (9th Cir. 1987). The "RFPA" requires law enforcement agencies to follow certain procedure to obtain bank records. It also sets forth civil penalties and injunctive relief for violations of its provisions. 12 U.S.C. §§ 3417, 3418. However, the RFPA provides that "[t]he remedies and sanctions described in this chapter shall be the only authorized judicial remedies and sanctions for violations of this chapter." <u>Id.</u> § 3417. The Ninth Circuit has affirmed that the RFPA's stated "remedies are exclusive," and that the statute "excludes a suppression remedy." <u>United States v. Frazin</u>, 780 F.2d 1461, 1466 (9th Cir. 1986) (affirming district court's denial of motion to suppress bank records); <u>see also</u> <u>United States v. Kington</u>, 801 F.2d 733, 737–38 (5th Cir. 1986) (affirming that "bank customers have no legitimate Fourth Amendment expectation of privacy in the records of their accounts maintained by banks," and holding that suppression of such records is not appropriate under the RFPA or a court's inherent supervisory powers).

Neither the Fourth Amendment, which is inapplicable to the evidence seized, nor the RFPA which includes no suppression remedy, permits this Court to suppress the evidence at issue. Because the suppression remedy is simply not available, the Court does not address whether the search warrant was supported by probable cause or otherwise lawful, and **DENIES** Bailey's motion.

## VII.   DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE SEIZED FROM VEHICLE STOP AND FRUITS THEREOF

On December 24, 2014, Bailey filed a motion to suppress evidence seized from, observations made of, and statements made during, a vehicle stop and search that occurred on or about January 7, 2011; in the alternative, he requested an evidentiary hearing. Dkt. No. 46. Dorsey joined in the motion on January 13, 2015. Dkt. No. 55. The government filed a consolidated opposition on January 26, 2015, and Bailey replied on February 9, 2015. Dkt. Nos. 64, 69. In briefs and declarations, the parties offered different factual accounts of the traffic stop and search; the parties also contested the legal standards applicable to searches conducted pursuant to probation search terms.

On February 19, 2015, the government filed a supplemental opposition representing that the prosecution and defense had conferred and agreed that the Court should postpone ruling on this motion, and consider the other suppression motions discussed herein "with the evidence of the traffic stop and ski mask excised from the statements of probable cause supporting the other

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                '**O**'

search warrant applications." Dkt. No. 78 at 1. While still maintaining its position that the traffic stop and search were valid, the government asserts that it is willing to forgo the presentation of any evidence arising from the traffic stop. "Specifically, the government is willing to forgo presenting to the jury any evidence that defendants were together on January 7, 2011, as well as any evidence related to the black ski mask that was recovered during a probation search of the vehicle, and anything the defendants said during the stop." Id. at 2–3. At oral argument, both government and defense counsel asserted that they wished the Court to defer ruling on the instant motion, and the prosecution affirmed that it would not seek to introduce the aforementioned evidence.

At the February 23, 2015 hearing, Bailey's counsel asserted that even though the government has agreed not to introduce evidence directly obtained from the traffic stop, defendants believe that LAPD documents related to that stop may provide an independent basis to suppress other evidence. At defendants' request, the Court will review *in camera* the subpoenaed documents related to the January 2011 traffic stop, and determine if any of that documentation should be produced to the defense. The Court does not rule on the traffic stop motion at this time.

## VIII. BAILEY'S MOTION TO SUPPRESS RESIDENCE AND VEHICLE SEARCHES

On December 24, 2014, Bailey filed a motion to suppress all evidence seized and observations resulting from (1) a search of Bailey's residence at 3551 South Western Avenue, Apartment #5, Los Angeles, California (the "residence"), and (2) a search of a 2005 black Kia sedan allegedly associated with Bailey, both executed pursuant to a federal search warrant issued on or about June 11, 2014 (the "Kia sedan"). Dkt. No. 47. The government filed an opposition on January 26, 2015, and Bailey replied on February 9, 2015. Dkt. Nos. 62, 70.

### A.    Background

On June 11, 2014, United States Magistrate Judge Charles Eick issued a warrant authorizing the search of Bailey's residence and the black Kia sedan identified above, as well as a hotel room, storage unit, and two vehicles not relevant to the instant motion. Dkt. No. 47 Ex. A. The application for this warrant was supported by an affidavit sworn by Gary Bennett ("Bennett"), an FBI agent with thirteen years of experience at the time. Id. Ex. A (Bennett Aff.) ¶ 1. The affidavit identifies the residence by address and physical description, and the Kia sedan by license plate number, registrant, year, make, and color. Id. ¶ 5.

The affidavit explains that the FBI and two police departments had been investigating a number of robberies "committed by two men who have worn similar clothing during many of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                     **'O'**

the robberies" and conducted pursuant to a consistent pattern, "including the use of a large 'cowboy-style' pistol.' "  Id. ¶ 6.  Bennett averred that in most of these robberies,

> one or both men would enter the victim commercial institution wearing dark clothing (black hoodie sweatshirt, black sweatshirt, blue jeans, for example) and a mask or bandana concealing his face.  One or both of the men would typically be armed with a large chrome revolver and/or a blue steel semiautomatic handgun.  One of the men would point a firearm at the cashier, demand that he or she open the cash register, and take the money from the register.

Id. ¶ 10.   In six of those robberies, the affidavit continues, witness statements or security video revealed that the robbers fled in a dark-colored vehicle.  After the September 30, 2013 robbery of a Papa John's pizza restaurant, a witness observed the suspects entering a dark "compact vehicle" with a license plate that read in part "6TNB."  Id. ¶ 11.  Just prior to the October 6, 2013 robbery of an ARCO gas station, another witness observed a dark Nissan Altima parked in an alley behind the station, with a license plate number that included the last three digits "435."  Shortly thereafter, Dorsey was involved in a minor traffic collision while driving a black Nissan Altima registered to Dorsey's wife and with the license plate number "6TBN435," which "matches the two previously-reported partial plates—with the 'B' and the 'N' interposed."  Id. ¶ 12.

The affidavit details security video footage showing that, just before an ARCO gas station was robbed on October 25, 2013, Dorsey—"wearing the same jeans and black and gray tennis shoes with white trim that one of the Cowboy Gun Bandits wore during many of the robberies"—exited a black Nissan Altima, entered the store, paid for gas with cash, and looked into the open cash register.  Approximately five minutes later, the video shows "a person who matches the physical description of Bailey—which also matches the physical description of the second Cowboy Gun Bandit—entering the ARCO and pointing a chrome revolver at the clerk and another person."  The video shows the suspect "attempting to take the money with his left hand" and "suggests that the second Cowboy Gun Bandit is having trouble grasping the money."  The video also "appears to demonstrate that a finger of the second Cowboy Gun Bandit's left glove is empty," and shows the suspect "setting the gun down on the counter and taking the money with his right hand" before "fleeing in the direction of the place where the black Nissan Altima was last seen."  Bennett stated that he knew from Bailey's criminal history records that he "is missing a finger on his left hand."  Id. ¶ 13.  Bennet declared that security videos of two other specific robberies also "appear to show that one finger of the second Cowboy Gun Bandit's glove appears to be empty."  Id. ¶ 14.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**          **'O'**

The affidavit then discusses security footage from the November 5, 2013 robbery of a Citibank in Glendale.  This video shows one suspect "wearing the same black and gray tennis shoes with white trim and jeans that he wore during some of the previous robberies, which are the same shoes and jeans Dorsey wore at the ARCO gas station on October 25, 2013." According to the affiant, "several frames of the security video show that one finger of the second Cowboy Gun Bandit's left glove is bent in odd directions, as though there is no finger supporting the glove." Id. ¶ 15.  The video then shows the two men fleeing the bank.  A witness reported that the two suspects "left the area in a gold/champagne colored Nissan Versa." Bennet declared that Hertz rental car records reflect that from October 31, 2013 to November 8, 2013, Bailey rented a Nissan Versa.  Id. ¶ 17.

Next, the affidavit sets forth the following evidence linking Dorsey and Bailey: on August 6, 2013, Dorsey was cited while driving a vehicle that Bailey had rented, and on November 5, 2013 (the same day as the Citibank robbery), Bailey and Dorsey were together at the Hollywood Tow, wearing "pants and shoes similar to the pants and shoes they appear to have been wearing during several of the robberies." Id. ¶ 18.  The affidavit also mentions that on June 3, 2014, a federal grand jury returned a sealed indictment charging Dorsey and Bailey with conspiracy to commit Hobbs Act robberies, five individual Hobbs Act robberies, and five counts of use of a firearm in furtherance of a crime of violence.  Id. ¶ 20.

The affidavit sets forth the following facts as basis for the belief that Bailey was at the time using the residence.  On June 2, 2014, two LAPD detectives knocked on the door using a ruse; a man who Marsden identified as Bailey answered the door and directed the detectives to the manager of the apartment complex.  Additionally, Bailey listed the address of the residence on his California driver's license, and public database information indicated that he had been residing there since March 2013.  Id. ¶ 21.  Bennett averred that there was a reasonable basis for concluding that evidence of the robberies would be found at the residence for several reasons. First, Bailey had worn "the same clothes" for many of the robberies he committed, and "people generally maintain clothing at their residences." Id. ¶ 28.  Second, Bennett declared that he knows from his training and experience that people "often keep firearms because they are valuable and serve as a means of protection," and that robbers (particularly felons who are not legally permitted to carry firearms, a category that includes Bailey) "often hide or conceal firearms at their residences . . . where they can keep them safe from law enforcement." Id. ¶ 30. In particular, Bennett noted that the "Cowboy Gun" revolver used in many of the robberies "is very distinctive," is an uncommon "Colt 'Flat Top' revolver," and "may have personal significance to Bailey, who brandishes that particular gun in many of the robberies." "Because of its large size and classic appearance," Bennet stated that he did not think the suspects would "get rid of the 'Cowboy Gun' revolver in the same manner in which robbers might discard other guns used in crimes." Id. ¶ 31.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    **'O'**

The affidavit sets forth the following facts as basis for the belief that Bailey was using the Kia sedan at the time.  LASD surveillance units observed Bailey driving the vehicle on or about November 24, 2013.  Marsden also observed the vehicle parked across the street from Bailey's residence on June 2 and June 3, 2014.  Finally, law enforcement photographed the vehicle on November 19, 2013 and February 7, 2014; in each photograph, the driver appeared to be Bailey. Id. ¶ 26.  Bennet declared that he believed that the Kia sedan could contain clothing that might identify him as one of the robbers, the distinctive Cowboy Gun revolver, or Bailey's cellular telephone, and that it also could have been purchased with robbery proceeds.  Id. ¶ 34. Moreover, the affidavit states that "law enforcement has sophisticated means to obtain trace hair, fiber and DNA evidence" from the car and that if agents were to obtain samples belonging to Dorsey in the Kia sedan, "that would further establish the connection between the two men and show that it was more likely that they were both involved in the robberies."  Id. ¶ 35. Finally, Bennett indicated his belief that it was "likely that Dorsey and/or Bailey have not yet spent all the money they are believed to have stolen from the Citibank" (over $55,000), and stated that the places to be searched could contain large amounts of cash that would constitute further evidence of criminal involvement.  Id. ¶ 36.

The warrant authorized the seizure of firearms and related evidence; clothing or footwear identified in any description or surveillance footage of the Cowboy Gun Bandits, Dorsey, or Bailey; cellular telephones possessed by the Cowboy Gun Bandits, Dorsey, or Bailey; certain kinds of digital information; bank records; property and vehicle records; keys to any storage units, lockers, safes, or vehicles; photographs; and currency in excess of $500.  Id. Attach. B.

### B.    Analysis

The general legal standards applicable to determining whether a search warrant is supported by probable cause are set forth at section IV.B.1, above.

"[I]t cannot follow in all cases, simply from the existence of probable cause to believe a suspect guilty, that there is also probable cause to search his residence."  United States v. Lucarz, 430 F.2d 1051, 1055 (9th Cir. 1970).  But "[d]irect evidence linking criminal objects to a particular sites is not required" for a warrant to issue.  United States v. Jackson, 756 F.2d 703, 705 (9th Cir. 1985).  "When a magistrate judge issues a search warrant for a residence, he must find a 'reasonable nexus' between the contraband sought and the residence."  United States v. Chavez-Miranda, 306 F.3d 973, 978 (9th Cir. 2002).  "In making this determination, a magistrate judge need only find that it would be reasonable to seek the evidence there."  Id. This determination is properly informed by such considerations as "the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    'O'

inferences as to where a criminal would be likely to hide stolen property." <u>Lucarz</u>, 430 F.2d at 1055.

The prosecution summarizes the relevant evidence contained in the affidavit as follows:

> Among the information before Judge Eick that established probable cause that Bailey was the second Cowboy Gun Bandit—including the fact that a grand jury had already returned an indictment against Bailey and Dorsey for the robberies committed by the Cowboy Gun Bandits—were the following facts: (a) Bailey, like one of the Cowboy Gun Bandits, was missing the ring finger on his left hand; (b) Bailey and Dorsey were known associates . . .; (c) one of the Cowboy Gun Bandits' getaway cars was registered to Dorsey's wife; (d) their other getaway car matched the specific description of the car that Bailey was renting at the same time that the Cowboy Gun Bandits robbed the Citibank in Glendale; (e) five minutes after Dorsey was caught on Camera casing an ARCO gas station with no mask on, the second Cowboy Gun Bandit, who was missing a finger on his left hand, robbed the ARCO station; (f) surveillance video taken during the other robberies shows that the second Cowboy Gun Bandit was missing a finger; and (g) security video from a tow-yard in Hollywood show[s] that Bailey and Dorsey [were] together a few days before—and on the same day as—the Cowboy Gun Bandits robbed the Citibank in Glendale.

Dkt. No. 62 at 2. The Court agrees that the affidavit contained facts sufficient for the magistrate judge to conclude that there was a "fair probability" that Bailey was one of the Cowboy Gun Bandits.

Bailey's arguments to the contrary are unpersuasive. Essentially, Bailey dissects each bit of evidence and argues that, standing alone, no reasonable inference of criminality can be drawn from it. He contends that evidence of the modus operandi of the series of robberies suggested that they were committed by the same persons, but not necessarily by Bailey; he also argues that the fact that the black Nissan Altima was sometimes used as a getaway vehicle and was linked to Dorsey has no relevance as to Bailey. Dkt. No. 47 at 9–10. Bailey argues that evidence generally linking him to Dorsey is irrelevant because it lacks a sufficient nexus to the target crimes. He also asserts that "the fact that Bailey and Dorsey were seen together in Hollywood shows that they had contact with one another on the day of the Citibank robbery but does not demonstrate that Mr. Bailey was in Glendale that day robbing the bank." <u>Id.</u> at 11-12. This approach ignores the "totality of the circumstances" approach that applies to probable cause. The magistrate judge could reasonably have concluded that the ample evidence linking Bailey

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL                    'O'

and Dorsey, while innocent in isolation, increased the probability that Bailey was involved when viewed in conjunction with the other evidence described above, including evidence linking Dorsey to the series of robberies.

Equally unavailing are Bailey's attempts to undercut evidence identifying him as one of the robbers as bare conclusions, unsupported by underlying facts.  Although the clothes and shoes Bailey is alleged to have worn during the robberies and in other settings are not unusual, the magistrate judge could have taken the similarities into account as one of many factors supporting probable cause.  More important, several videos showed that one of the robbers—like Bailey—was missing a finger on his left hand, a highly probative identifying detail.  Bailey's attempts to discount this evidence by seizing on words like "appears" and "suggests" in the affidavit impose a much higher standard of proof than the "practical, common-sense" inquiry that applies to a determination of probable cause.  See United States v. Kelley, 482 F.3d 1047, 1050 (9th Cir. 2007) ("Neither certainty nor a preponderance of the evidence is required.").  Finally, the Court finds unpersuasive Bailey's protest that the "affidavit fails to mention . . . that from approximately 2010 to 2013 Mr. Bailey had rented approximately 21 vehicles from rental companies as his regular mode of transportation."  Dkt. No. 44 at 12–13. This fact does not undercut the significant probative value of the fact that, at the time of the Citibank robbery, Bailey was renting a car of the same make and model as the one used to escape from that robbery.  Finally, the magistrate judge could properly have taken into account the fact that a grand jury had already indicted Bailey and Dorsey for the charged crimes when the search warrant was issued.  See United States v. Hernandez-Escarsega, 886 F.2d 1560, 1566 (9th Cir. 1989) ("Although the fact that the grand jury found probable cause to believe that Hernandez was involved in the importation of narcotics is not determinative, it could certainly be considered by the magistrate." (citations omitted)).

Bailey contends that, even if a magistrate judge could reasonably believe that Bailey was one of the robbers, he could not reasonably believe that a search of the residence and Kia sedan would lead to the discovery of any evidence.  Bailey submits that the clothes identified with the robberies were commonplace, and that the affidavit lacks factual support for its statement that "people generally maintain clothing at their residences or in their vehicles."  Dkt. No. 47 at 14. Bailey rejects as similarly conclusory Bennett's statement that he knows from his training and experience that persons often keep firearms at their residences or in their vehicles.  Id. at 15. Finally, he argues that because there is no allegation that "bait money" was stolen from Citibank, a magistrate judge could not reasonably have concluded that any cash found during the search came from Citibank.

These arguments fail as well.  "A magistrate [judge] is permitted to draw reasonable inferences about where evidence is likely to be kept based on the nature of the evidence and the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**          **'O'**

type of offense," and " 'may rely on the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found.' "  United States v. Terry, 911 F.2d 272, 275 (9th Cir. 1990) (quoting United States v. Fannin, 817 F.2d 1379, 1382 (9th Cir. 1987)); see United States v. Sayakhom, 186 F.3d 928, 934 (9th Cir. 1999) (affirming denial of motion to suppress evidence of mail fraud found in residence and car where affiant "stated his experience and belief that operators of businesses that involve paperwork typically maintain and carry business records into and out of their offices, in their cars and to and from their residences," permitting the "reasonable conclusion that the evidence described in the warrant would be found in [defendant's] vehicle and residence").  The magistrate judge could reasonably have credited, as supported by Bennett's experience and basic common sense, the assertion that Bailey was likely to keep in his residence and car clothes he had repeatedly worn in robberies, as well as a distinctive gun used in many of those robberies and cash obtained therefrom.  See, e.g., Jackson, 756 F.2d at 705 ("It was a reasonable inference that Jackson might keep stolen currency in his apartment from a bank robbery two months earlier," where not all of the money stolen had been accounted for.); United States v. Gann, 732 F.2d 714, 722 (9th Cir. 1984) (finding probable cause where affidavit included agent's "perception that bank robbers frequently use firearms and leave such weapons, ammunition and clothing in their cars or residences"); United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993) ("[C]ash is the type of loot that criminals seek to hide in secure places like their homes . . . . Similarly, clothing and firearms[] are the also the types of evidence likely to be kept in a suspect's residence.").  The affiant's contention that any traces of Dorsey in the Kia sedan would have further linked Bailey to Dorsey (and thus to the robberies) could also reasonably have factored in to the magistrate judge's finding of probable cause.

Bailey also argues that the information contained in the affidavit was stale, and could not support a reasonable belief that, more than seven months after the commission of the last robbery, Bailey would keep in his residence or a vehicle that he drove the Cowboy Gun, distinctive clothing, or other evidence.  "The age of the information supporting the application for a warrant is a factor that a magistrate [judge] should consider.  It is, however, only one factor.  If other factors indicate that the information is reliable and that the object of the search will still be on the premises, then the magistrate [judge] should not hesitate to issue a warrant." United States v. Batchelder, 824 F.2d 563, 564 (7th Cir. 1987) (finding probable cause to search for illegal gun silencers despite nine-month delay, where affiant indicated that individuals who purchased such silencers tend to keep them for extended periods of time).  Here, it was reasonable to conclude that clothes that were not on their face incriminating would remain in Bailey's residence or a car he was driving, even several months after the last robbery.  See United States v. Jacobs, 715 F.2d 1343, 1346 (9th Cir. 1983) (per curiam) ("The articles of clothing identified in the affidavit and warrant were not unusual, nor incriminating in themselves.  Although three and a half months passed between the earliest prior bank robbery in

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    **'O'**

which the clothing sought had been worn by the robbers and the issuance of the warrant, it was reasonable for the magistrate to conclude that such articles of clothing would remain at the residence.").  It was also reasonable to conclude that Bailey may have retained a distinctive and uncommon firearm that had been repeatedly used in a series of multiple robberies over a two-month span, and that the firearm might be found in Bailey's residence or the Kia sedan even several months later.  See United States v. Dozier, 844 F.2d 701, 707 (9th Cir. 1988) (in evaluating a staleness argument, an "important factor is the ongoing nature of a crime which might lead to the maintenance of tools of the trade").  Finally, it was reasonable to conclude, based on an affidavit that included facts going to how much of the allegedly stolen money could be accounted for by previous purchases, that Dorsey and Bailey may not have spent all of the robbery proceeds, and that significant amounts of cash might remain at Dorsey's residence or in the vehicle he had been using.

The Ninth Circuit and other courts have found probable cause for search warrants issued after similar intervals and for similar evidence.  See, e.g., Dozier, 844 F.2d at 707 (warrant for documentary records issued almost six months after an investigation, and despite intervening raid and arrest of others involved in marijuana cultivation operation); United States v. Grandstaff, 813 F.2d 1353, 1355–57 (9th Cir. 1987) (per curiam) (reversing suppression of evidence obtained pursuant to warrant issued five months after robbery); Jacobs, 715 F.2d at 1346 (upholding search warrant for clothing worn by robbers issued three-and-a-half months after robbery); United States v. Pelham, 749 F. Supp. 304, 308–09 (D.D.C. 1990) (finding probable cause despite six-month delay, and collecting cases for the proposition that a long delay is less significant where the "search warrant lists items innocent on their face" such as clothing).  Here, the Court concludes that the magistrate judge's finding of probable cause was reasonable despite the seven-month gap between the last robbery and the issuance of the search warrant.

For the foregoing reasons, the Court finds that the search warrant in question was supported by probable cause to believe that Bailey was one of the Cowboy Gun Bandits, and that there was a "fair probability" that evidence of the target crimes could be found in the residence and the Kia Sedan.  At the very least, the government has carried its burden of showing that a reasonably well-trained executing officer could reasonably have relied on the validity of the warrant.  See United States v. Leon, 468 U.S. 897, 922 (1984) (holding that evidence is admissible if the executing officers acted in objectively reasonable reliance on a facially valid warrant later found to be invalid).  Therefore, the Court **DENIES** Bailey's motion to suppress evidence obtained from the residence and vehicle searches.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**          **'O'**

## IX.   DEFENDANTS' MOTIONS TO SEVER COUNTS AND DEFENDANTS

On December 24, 2014, Bailey filed a motion to sever the robbery counts from each other, and for a separate trial from Dorsey.  Dkt. No. 48.  On January 13, 2015, Dorsey joined in that motion and added limited briefing of his own.  Dkt. No. 50.  The government filed a consolidated opposition on January 26, 2015.  Dkt. No. 57.  For the following reasons, the motions are **DENIED**.

### A.   Legal Standards

An indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a).  An indictment "may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim P. 8(b).  "[W]here both multiple defendants and multiple offenses are involved, the propriety of joinder is governed by Fed. R. Crim. P. 8(b)." United States v. Guerrero, 756 F.2d 1342, 1345 (9th Cir. 1984) (citing United States v. Ford, 632 F.3d 1354, 1371 (9th Cir. 1980)).

" '[B]ecause Rule 8 is concerned with the propriety of joining offenses in the indictment, the validity of the joinder is determined solely by the allegations in the indictment.' " United States v. Jawara, 474 F.3d 565, 573 (9th Cir. 2006) (quoting United States v. Terry, 911 F.2d 272, 276 (9th Cir. 1990)).  "Rule 8 has been 'broadly construed in favor of initial joinder.' " Id. at 573 (quoting United States v. Friedman, 445 F.2d 1076, 1082 (9th Cir. 1971)); United States v. Armstrong, 621 F.2d 951, 954 (9th Cir. 1980) ("[J]oinder is the rule rather than the exception.").

Even where initial joinder was proper, "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).  The decision whether to sever properly joined defendants under Rule 14 is "committed to the sound discretion of the trial court." United States v. Adams, 581 F.2d 193, 197 (9th Cir. 1978).

### B.   Severance of Counts

In this case, the substantive robbery counts were properly joined as the overt acts of a charged conspiracy.  "Ordinarily, the mere charging of a conspiracy count linking together

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL                      'O'

substantive counts against various defendants fully satisfies the Rule 8(b) requirement of relatedness and makes joinder proper under the rule." United States v. Valenzuela, 596 F.2d 824, 829 (9th Cir. 1979); see also United States v. Guerrero, 756 F.2d 1342, 1345 (9th Cir. 1984) ("As the conspiracy charged encompassed both the robbery and drug offenses, the joinder of these defendants and offenses was proper."); Fernandez v. United States, 329 F.2d 899, 905 (9th Cir. 1964) ("In view of the conspiracy count wherein all of the defendants were alleged to have participated in the same series of acts or transactions constituting the offenses described in the substantive counts, the initial joinder of offenses and defendants in the two indictments was authorized under Rule 8(b)."); United States v. Sexton, 586 F. App'x 304, 305 (9th Cir. 2014) (unpublished) ("The indictment alleges that the [three bank robberies] were committed in furtherance of a single, overarching conspiracy.  The substantive counts were therefore part of a 'common scheme or plan' for joinder purposes.").

Further, neither defendant has shown grounds for severance under Rule 14.  Bailey argues that severance is required or advisable because "distinctly different victims were [] robbed, namely a pizza restaurant, gas station stores and a bank."   He contends that "it will be difficult for the jury to consider each robbery separately."  Dkt. No. 48 at 8.[20]  The government responds that the counts may properly be tried together because "[t]he charged robberies were all committed with[in] a span of 35 days, all involved the armed robbery of the employees of a business that transacted in cash, and all involved men in black hoodies, wearing masks or bandanas that covered their faces."  The government also points out that the charged robberies took place in a relatively concentrated geographical area, and are linked as the overt acts of a charged conspiracy. Dkt. No. 57 at 3 & Ex. A.  Finally, the prosecution argues that, even absent the conspiracy charge, evidence from the various counts would be admissible to prove the others because "identity is expected to be the central issue for trial" and significant modus operandi evidence will be introduced.  Id. at 6.

The Court agrees with the prosecution.  Bailey's arguments boil down to the generic proposition that a jury cannot compartmentalize evidence of distinct but similar crimes.  But prejudice from a refusal "to sever counts can be cured by proper jury instructions, and juries are generally presumed to follow their instructions."  United States v. Hickerson, 489 F.3d 742, 746 (5th Cir. 2007).  Bailey has advanced no persuasive reason to sever the properly joined robbery

---

[20]Bailey also argues that the "prejudice is heightened" because of the 18 U.S.C. § 924(c) gun counts attached to the robbery charges, which provide for greater sentencing enhancements for a "second or subsequent conviction" than for a first conviction under the subsection. Dkt. No. 48 at 9.  But Bailey cites no legal authority for the proposition that the charging of sentencing enhancements linked to the substantive counts militates in favor of severance.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL                     'O'

counts, and has not explained why the jury will be unable to separate evidence of the various counts.  Moreover, evidence from one count may be admissible with regard to others to prove identity, further reducing the prejudice from joint trial.  See United States v. Johnson, 820 F.2d 1065, 1070–71 (9th Cir. 1987) (affirming denial of severance motion where evidence of one count would have been admissible to prove identity with regard to the other count under Federal Rule of Evidence 404(b)).  In short, Bailey has not shown that a failure to sever will result in clear, manifest, or undue prejudice, so as to deny him a fair trial.  United States v. Felix-Gutierrez, 940 F.2d 1200, 1209 (9th Cir. 1991).  See Sexton, 586 F. App'x at 305 (affirming refusal to sever three separate bank robberies; United States v. Son Van Nguyen, No. CR SP99-0433 WBS, 2002 WL 32103063, at *2–3 (E.D. Cal. Nov. 7, 2002) (rejecting an argument that charged robberies of a jewelry store should be severed from charged robberies of a computer store, finding a "logical relationship" and "large area of overlapping proof" between the counts).

Dorsey adds no substantive argument on the propriety of a joint trial of the various counts.  Therefore, neither defendant has met his burden of showing that the counts should be severed.

### B.     Severance of Defendants

1.     Bailey Has Not Shown that Joinder Is Improper or Severance Justified.

The indictment properly joins Bailey and Dorsey as coconspirators alleged to have jointly carried out robberies that form the overt acts of the charged conspiracy.  As discussed above, the Ninth Circuit has long "held that a conspiracy count will provide the necessary link to satisfy the requirements of Rule 8(b)."  United States v. Adams, 581 F.2d 193, 197 (9th Cir. 1978); see United States v. Abushi, 682 F.2d 1289, 1296 (9th Cir. 1982) ("We have repeatedly held that a conspiracy count may provide the necessary link to satisfy the requirements of Rule 8(b).").

Nor has Bailey shown that joinder of the codefendants is so prejudicial as to warrant severance under Rule 14.  "Generally, defendants who are indicted together in federal court should be jointly tried."  United States v. Tootick, 952 F.2d 1078, 1080 (9th Cir. 1991).  "Joinder is favored in federal criminal cases largely for reasons of judicial economy and efficiency, despite some degree of bias inherent in joint trials."  Id.  On a Rule 14 motion, "[t]he burden of demonstrating prejudice rests on the [defendant], and is a heavy one."  Adams, 581 F.2d at 198.  The defendant "must show that 'joinder was so manifestly prejudicial that it outweigh[s] the dominant concern with judicial economy.' "  United States v. Garcia, 506 F. App'x 593, 595 (9th Cir. 2013) (unpublished) (quoting United States v. Douglass, 780 F.2d

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                'O'

1472, 1478 (9th Cir. 1986)).  It is not enough for a defendant to show that he "may have a better chance of acquittal in separate trials,"[21] that his codefendant is more culpable,[22] or that the evidence against his codefendant is stronger.[23]  This burden is especially heavy when a conspiracy is charged.  See United States v. Cruz, 127 F.3d 791, 799 (9th Cir. 1997), abrogated on other grounds by United States v. Jiminez Recio, 537 U.S. 270 (2003) ("A joint trial was particularly appropriate here because the defendants were charged with conspiracy.").  This is so because where a conspiracy is charged, much of the evidence admitted against one defendant would be admissible against the other—even in a separate trial—as proof of the conspiracy. See id.

Bailey argues that he should be tried separately because the prosecution intends to offer evidence that Dorsey "originally made his money working as a 'pimp,' but when his source of prostitutes disappeared, he resorted to the robberies to account for the lost income."  Dkt. No. 48 at 4.  But the prosecution represents that it "does not intend to introduce, in its case-in-chief, the fact that Dorsey is a known 'pimp' . . . or the fact that Bailey has at least three prior felony convictions for robbery."  Dkt. No. 57 at 2 (emphasis in original).  Bailey's argument is therefore unpersuasive at this point and, to the extent that any of the prostitution-related evidence comes in as impeachment evidence, "[j]udicial economy justifies reliance on the jury to follow the instructions of the court that segregate the evidence and limit the applicability of the evidence to each defendant."  United States v. Vaccaro, 816 F.2d 443, 448 (9th Cir.), cert denied, 484 U.S. 928 (1987).

Bailey also argues that he will be prejudiced by evidence that (1) Dorsey was found to be in possession of ammunition that purportedly matches the "Cowboy Gun" used in the charged robberies; (2) Dorsey was connected with the car belonging to Martin and allegedly used in some of the robberies; and (3) a security video shows Dorsey entering one of the robbed stores five minutes before it was robbed, wearing clothing that appears to match that worn by one of

---

[21]Zafiro v. United States, 506 U.S. 534, 540 (1993); United States v. Tootick, 952 F.2d 1078, 1080 (9th Cir. 1991) ("Merely showing that a comparative advantage would result from separate trials will not satisfy [the defendant's] burden.").

[22]United States v. Van Cauwenberghe, 827 F.2d 424, 432 (9th Cir. 1987) ("[T]he mere fact that a criminal defendant is jointly tried with a more culpable co-defendant is not alone sufficient to constitute an abuse of the district court's discretion.").

[23]United States v. Brady, 579 F.2d 1121, 1127 (9th Cir. 1978) ("[T]he fact that the evidence against one codefendant is more damaging than the evidence against another one is not a ground for severance.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    **'O'**

the suspects in previous robberies.  The government responds that much of this evidence is also relevant to Bailey, arguing that, among other evidence linking Bailey and Dorsey, the same surveillance video capturing Dorsey's face shows a suspect who the government contends is Bailey committing the robbery a few minutes later.  The government also posits that the ammunition "would be admitted against Bailey, as he brandished that firearm in several of the robberies."  Dkt. No. 57 at 10–11.

Without expressing any opinion on the ultimate admissibility of this evidence against Bailey, the Court finds that Bailey has not met his heavy burden of showing the type of prejudice that would justify severing the trials of alleged coconspirators.  See United States v. Matta–Ballesteros, 71 F.3d 754, 771 (9th Cir.1995) (affirming district court's refusal to sever where codefendants were jointly tried for conspiring to commit and committing various violent acts, even though the joint trial meant the introduction of evidence involving three homicides and a marijuana enterprise with which the appellant was not involved).  To the extent that any of the evidence Bailey identifies as prejudicial would not be admissible against him in a separate trial, "[t]he prejudicial effect of evidence relating to the guilt of co-defendants is generally held to be neutralized by careful instruction by the trial judge."  United States v. Escalante, 637 F.2d 1197, 1201 (9th Cir. 1980); see United States v. Van Cauwenberghe, 827 F.2d 424, 432 (9th Cir. 1987) ("When, as here, the District Court instructed the jury to consider the guilt or innocence of each co-defendant separately, in light of the evidence against that defendant, the jury is presumed to have obeyed."); Guerrero, 756 F.2d at 1345–46 ("Although some of the evidence adduced at trial related only to the guilt of one or more, but less than all of the defendants, defendants have not satisfactorily demonstrated why the jury could not reasonably have compartmentalized the evidence against each defendant in view of the careful instructions given by the trial judge.").

> 2.     Dorsey Has Not Shown That Severance Is Justified.

Joining in Bailey's motion, Dorsey adds that Bailey has prepared an affidavit in which he "relates that Mr. Dorsey is not involved in any of the robberies that Mr. Bailey is charged with."[24]  Dkt. No. 50 at 2.  Dorsey argues that severance is mandatory because he has a right to call Bailey to testify on his behalf, and cannot do so if the two defendants are tried together.

_____

[24]Dorsey also states that "there are factors in the evidence concerning Mr. Bailey that would potentially prejudice the jury's consideration of the evidence against Mr. Dorsey."  Dkt. No. 50 at 2.  But Dorsey provides no details that would permit the Court to evaluate this claim.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**          **'O'**

"Severance is rarely granted on the ground that a codefendant's testimony was excluded, primarily because considerations of judicial economy merit serious attention when defendants move for severance."  United States v. Hernandez, 952 F.2d 1110, 1115 (9th Cir. 1991) (internal quotation marks, citations, and brackets omitted).  When a defendant argues for severance because of the need for a codefendant's testimony, he must show " '(1) that he would call the codefendant at a severed trial, (2) that the codefendant would in fact testify, and (3) that the testimony would be favorable to the moving party.' "  Id. (quoting United States v. Jenkins, 785 F.2d 1387, 1393 (9th Cir. 1986)).  "In considering a defendant's claim that a codefendant will provide exculpatory testimony, a district court must weigh a number of factors, among them, the good faith of the defendant's intent to have a codefendant testify, the possible weight and credibility of the predicted testimony, the probability that such testimony will materialize, and the economy of a joint trial."  United States v. Mariscal, 939 F.2d 884, 885 (9th Cir. 1991) (internal quotation marks and brackets omitted); see also United States v. Castro, 887 F.2d 988, 998 (9th Cir. 1989) ("The district court must then consider the weight and credibility of the proposed testimony and the economy of severance.").  The court "must also consider the exculpatory nature and effect of the desired testimony-in other words, the degree to which the asserted codefendant testimony is exculpatory."  Mariscal, 939 F.2d at 885.  The movant "must show more than that the offered testimony would benefit him; he must show that the codefendant's testimony is 'substantially exculpatory' in order to succeed."  Id. at 886 (quoting United States v. Ford, 870 F.2d 729, 732 (D.C. Cir. 1989)).

Dorsey admits that "[i]t is not clear under what circumstances [] Mr. Bailey prepared and filed his declaration, or whether he was represented by counsel at the time," and that he is unable to specify what the testimony would be because Dorsey's defense counsel cannot speak with Bailey.  Id. at 2–4.  Dorsey nevertheless submits that Bailey "would be prepared to testify and provide exculpatory evidence" on Dorsey's behalf.  Id. at 2–3.

At present, Dorsey has not met his burden of showing that Bailey's purportedly exculpatory testimony justifies severance.  The Court finds persuasive the D.C. Circuit's analysis of a similarly vague and uncertain proffer of exculpatory codefendant testimony.  See United States v. Ford, 870 F.2d 729 (D.C. Cir. 1989), cited with approval in Mariscal, 939 F.2d at 885–86.  In that case, counsel for the appellant, Ford, had represented that Ford's codefendant, Green, would provide exculpatory testimony on Ford's behalf if the trials were severed.  The court first found that the Ford had not sufficiently shown that Green would be willing to testify, even though counsel for both codefendants had said that he would, because the offer of testimony "was conditioned on Green's case being tried first."  Id. at 731.  The court noted widespread judicial disapproval of this type of conditional offer, and warned that Rule 14 is not "a mechanism for alleged co-conspirators to control the order in which they are tried."  Id. (citing United States v. Gay, 567 F.2d 916, 919–20 (9th Cir. 1978)).  The court then held that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**               **'O'**

Ford had "failed to meet the burden of establishing with requisite specificity the exculpatory 'nature and effect' of his co-defendant's testimony." Id. at 732. The court explained:

> [T]he nature of Green's expected testimony was addressed by counsel on three separate occasions. First, when appellant's counsel initially moved for severance, he simply stated his belief that Green would provide exculpatory evidence. Later, Green's counsel added his understanding of Green's expected testimony (that appellant "had nothing to do with the transaction"). Finally, at the close of the government's case, appellant's counsel raised the severance issue again, stating that Green "would testify that Mr. Ford never got out of the car and didn't participate in the transaction." None of these statements are of sufficient specificity to warrant overturning the District Court's determination [not to sever]. In essence, these statements reduce to a reaffirmation of appellant's "not guilty" plea. They represent an assertion of ultimate fact, but do not provide the specific facts necessary for the District Court to determine that the movant "will be unable to obtain a fair trial without severance."

Id. (paragraph structure altered; citations omitted).

Here, it is even less certain that Bailey would in fact testify on Dorsey's behalf, because the Court does not have Bailey's position on whether he would testify, and Dorsey admits that it is unclear under what circumstances Dorsey prepared the affidavit, or whether he was represented by counsel at the time. As in Ford, the fact that Dorsey is attempting to control the order in which the codefendants are tried counsels caution. See Dkt. No. 50 at 5 ("[T]he court should grant Mr. Dorsey's request to sever the trials and permit Mr. Dorsey to conduct his trial after that of Mr. Bailey, so that [Dorsey] can call [Bailey] as a witness."). Additionally, Dorsey has not provided specific details of how Bailey's testimony would exculpate him, other than generally denying Dorsey's involvement—that is, Dorsey has "not provide[d] the specific facts necessary for the District Court to determine that the movant will be unable to obtain a fair trial without severance." Ford, 870 F.2d at 732 (internal quotation marks omitted). Accordingly, Dorsey has not shown that Bailey would in fact testify on his behalf, and that the testimony would be significantly favorable to Dorsey and non-cumulative. Hernandez, 952 F.2d at 1115.[25]

---

[25]At oral argument, Dorsey's counsel submitted that he did not have any additional information regarding Bailey's potential testimony, but asked that any denial of his motion to sever defendants be granted without prejudice to Dorsey's making a more detailed showing of Bailey's potential testimony at a future date. This motion is granted without prejudice to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    **'O'**

For these reasons, the Court **DENIES** the motions to sever counts and defendants, without prejudice to a showing of new facts in support of severance.

## X.    BAILEY'S MOTION TO SUPPRESS POST-ARREST, PRE-<u>MIRANDA</u> STATEMENTS

On December 24, 2014, Bailey filed a motion to suppress statements he made after his arrest but before being advised of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Dkt. No. 49.  Under that decision, a suspect in custody must be advised, in substance, as follows:

> "He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."

<u>Berghuis v. Thompkins</u>, 560 U.S. 370, 380 (2010) (quoting <u>Miranda</u>, 384 U.S. at 479).  "Before a defendant's self-incriminating statements may be admitted into evidence, 'a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' "  <u>United States v. Rodriguez</u>, 518 F.3d 1072, 1076 (9th Cir. 2008) (quoting <u>Miranda</u>, 384 U.S. at 475). "Statements obtained in violation of <u>Miranda</u> generally are inadmissible in the government's case-in-chief.  But a defendant's voluntary statements—even if obtained in violation of <u>Miranda</u>—are admissible as impeachment evidence."  <u>United States v. Gomez</u>, 725 F.3d 1121, 1125–26 (9th Cir. 2013) (citations omitted); <u>see also</u> <u>Oregon v. Elstad</u>, 470 U.S. 298, 307 (1985) ("Despite the fact that patently voluntary statements taken in violation of <u>Miranda</u> must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination." (emphasis omitted)).

On January 26, 2015, the government filed a response stating that it will not seek to introduce "any statements Bailey made during his post-arrest interview unless the defense, either through cross-examination or in the defense case, opens the door to any of his post-arrest statements."  Dkt. No. 65.  The prosecution states that if this occurs, it will "seek a ruling

Dorsey's making such a showing.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL                    'O'

regarding the admissibility of his statements before raising them in front of the jury." <u>Id.</u> Because it is unopposed, the Court **GRANTS** this motion without prejudice to the government seeking a ruling at trial that Bailey has opened the door to impeachment with otherwise inadmissible pre-<u>Miranda</u> warning statements.

## XI.   DORSEY'S MOTION TO PRECLUDE USE BY THE PROSECUTION OF ALLEGATIONS OF OTHER CRIMES, WRONGS, OR ACTS

On January 13, 2015, Dorsey filed a motion to preclude the prosecution from offering evidence or allegations that Dorsey acted as a "pimp" or was otherwise involved in the business of prostitution. Dkt. No. 53.  Dorsey contends that such evidence would be irrelevant and unfairly prejudicial, and should be excluded under Federal Rule of Evidence 404(b).  <u>See</u> Fed. R. Evid. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").

On January 26, 2015, the government filed a response stating that it does not intend to introduce evidence of Dorsey's alleged prostitution-related conduct in its case-in-chief.  Dkt. No. 61.  The government maintains, however, that it may seek to admit such testimony if Dorsey "opens the door" to such evidence at trial.[26]  <u>Id.</u>  The government also asserts that evidence in the possession of persons who allegedly worked for Dorsey as prostitutes could "be admitted without discussing Dorsey's relationship to the witness."  <u>Id.</u>  Because it is unopposed, the Court **GRANTS** this motion without prejudice to the government seeking a ruling at trial that Dorsey has opened the door to the type of evidence discussed herein.

## XII.   CONCLUSION

In accordance with the foregoing, the Court **GRANTS**:

• Dkt. No. 49: Motion to suppress post-arrest statements (without prejudice to the government's seeking a ruling on admissibility for impeachment purposes at trial);
• Dkt. No. 53: Motion to preclude other act evidence (without prejudice to the government seeking a ruling at trial that Dorsey has opened the door to such evidence).

---

[26]"Federal Rule of Evidence 404 restricts the use of evidence solely for purposes of demonstrating a criminal proclivity. It does not proscribe the use of other act evidence as an impeachment tool during cross-examination."  <u>United States v. Gay</u>, 967 F.2d 322, 328 (9th Cir. 1992).  Therefore, "404(b) evidence may be used for impeachment purposes."  <u>Id.</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    'O'

The Court **DENIES**:

- Dkt. No. 42: Motions to dismiss indictment on jurisdictional grounds;
- Dkt. No 43: Motion to suppress evidence from state cell site "warrant";
- Dkt. No. 44: Motion to suppress evidence from federal cell site warrant;
- Dkt. No. 45: Motion to suppress bank account information;
- Dkt. No. 47: Motion to suppress residence and vehicle searches;
- Dkt. No. 48: Motion to sever;
- Dkt. No. 50: Motion to sever;
- Dkt. No. 51: Motion to dismiss indictment on jurisdictional grounds;
- Dkt. No. 54: Motion for an evidentiary hearing with regard to federal cell site warrant.

As indicated in section VII, the Court defers ruling on the traffic stop suppression motion, and will conduct an *in camera* review of the subpoenaed documents related to that traffic stop to determine if they should be produced to the defense.

IT IS SO ORDERED.

|  | 01 | : | 53 |
|---|---|---|---|
| Initials of Deputy Clerk | | CMJ | |

cc: